JOSEFA COLÓN, como madre con patria potestad sobre su menor hijo natural reconocido, ALBERTO COLÓN, demandante y apelante, *v.* LA SUCESIÓN DE DON ALBERTO J. TRISTANI, compuesta de su heredera declarada DOÑA JULIA QUESADA Y MANDRI VDA. DE TRISTANI, demandada y apelada.

No. 5659.—*Sometido:* Junio 24, 1932. *Resuelto:* Diciembre 9, 1932.

*K. Atiles Moreu* y *Erasto Arjona Siaca,* abogados de la apelante; *A. S. Poventud,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Josefa Colón, como madre con patria potestad sobre su menor hijo natural reconocido, Alberto Colón, entabló demanda contra la Sucesión de Alberto J. Tristani, compuesta de su heredera y madre Julia Quesada y Mandri viuda de Tristani, solicitando que se declare que dicho menor Alberto

Colón es hijo natural reconocido de Alberto J. Tristani. Se alega en la demanda que dicho Alberto J. Tristani, allá por el año 1922, llevó relaciones amorosas con la demandante Josefa Colón en la ciudad de Ponce, viviendo maritalmente y en estado de público concubinato con ella en distintas residencias, entre otras en la Calle Victoria No. 69; que como resultado de dichas relaciones amorosas y concubinato público que se prolongó varios años fué procreado el menor Alberto Colón, quien gozó del estado continuo de hijo natural reconocido de su padre Alberto J. Tristani, quien atendía a su subsistencia, pagaba su hogar y cuidaba de él y le daba trato público, familiar y ostensible de hijo reconocido del mismo. Se alega además que la demandada, Julia Quesada y Mandri fué declarada única y universal heredera de dicho Alberto J. Tristani, y se solicita la nulidad de la sentencia en dicho caso.

La demandada negó en términos generales todos y cada uno de los hechos alegados en la demanda, y al terminar la práctica de la prueba, con permiso de la corte, presentó como una defensa especial la alegación que a continuación insertamos:

"Que en las fechas referidas en la demanda enmendada y muy especialmente al tiempo de la concepción por Josefa Colón del niño Alberto Colón, en mayo del año 1923, durante todo ese año hasta su fallecimiento en octubre 20 de 1928, el referido Alberto J. Tristani padecía y padeció de sífilis-tabo-paresis, que le imposibilitaba e imposibilitó para la procreación en y antes de las fechas que se dejan mencionadas."

La corte inferior declaró sin lugar la demanda, sin especial condenación de costas, por no considerar probados los hechos alegados en la misma.

De la opinión emitida por la corte inferior copiamos lo que sigue:

"La teoría de la demanda, de acuerdo con sus alegaciones, está basada en los incisos 2 y 3 del artículo 193 del Código Civil vigente, es decir, que la demandante fué conocida viviendo en concubinato

con Alberto J. Tristani durante el embarazo y al tiempo del nacimiento de su hijo Alberto Colón, y que éste estuvo en la posesión continua del estado de hijo natural de Alberto J. Tristani justificada por actos del mismo padre.

"La corte, por la apreciación que ha hecho de toda la prueba presentada por una y otra parte para sostener y rebatir la teoría anteriormente anunciada, es de opinión que la demandante no ha probado las alegaciones esenciales de su demanda, con prueba robusta y convincente, en ninguno de los dos aspectos de dicha teoría. La corte desea hacer constar que ha llegado a esta conclusión haciendo caso omiso de la prueba pericial presentada por la demandada, para sostener las alegaciones de su defensa especial.

"Se ha probado, a juicio de la corte, que la demandante Josefa Colón, allá por los años 1922 a 1924, fué la querida de Alberto J. Tristani y que éste la visitaba con alguna frecuencia por la noche, pero, en forma alguna se ha probado que Alberto J. Tristani viviera en concubinato con Josefa Colón, pues él tenía su hogar constituído en casa de su señora madre, la aquí demandada. Se ha probado que Alberto J. Tristani le daba dinero a la demandante y ayudaba a pagar la casa en unión del Sr. Fortier que se quería con la hermana de la demandante, pero no ha habido prueba alguna de que Tristani viviera públicamente con la demandante y por el contrario toda la evidencia demostró que cuando él la visitaba siempre salía de la casa de una a dos de la madrugada. Se ha probado además que la demandante, con anterioridad a Tritani, se quiso con Felipe Maldonado y que aun cuando llevaba relaciones con Tristani era visitada en su casa por otros hombres. Antonio García y Atilano Garay, dos cocheros, declararon que para los años 1922 y 1923 ellos acostumbraban a llevar pasajeros a la casa de la demandante que vivía con su hermana Margot, a las que llamaban 'Las Guarapito', y que la reputación que tenían era de que admitían hombres para ocuparse con ellas, habiendo declarado Garay que entre las personas que llevó varias veces estaba Tristani. Asimismo Antonio Iglesias declaró que para los años 1922 a 1923 él vivía cerca de la demandante y que salió a pasear con ella en el año 1923, a los baños de mar de 'Los Meros' y a los 'Baños de Quintana' y que tuvo contacto carnal con la demandante. Es cierto que tanto la demandante como su testigo Fortier negaron estos hechos al declarar en *rebuttal,* pero la demandante es parte interesada, y en cuanto al Sr. Fortier, la corte no pone en duda la buena fe con que declaró en este caso, pero no puede olvidar de que él era el querido de la hermana de la demandante contra la que se hizo parecida imputación que a ésta. Además, la tes-

tigo Petrona Suárez, de la propia demandante, declaró que aun en vida de Tristani la demandante se fué a vivir a Nueva York y hacía más de dos años estaba por allá y tenía otro hijo con otro hombre. Si tomamos en consideración todos los hechos relacionados con la vida de la demandante que antes que con Tristani se quiso con Maldonado y mientras llevaba relaciones con Tristani dejó a su hijo en Puerto Rico con su hermana y se fué para Nueva York y allí tuvo otro hijo con otro hombre, y allá vivía en octubre 20 de 1928, cuando falleció Alberto J. Tristani en Filadelfia, hay que convenir en que la corte no puede dar crédito a la alegada moralidad de la demandante y que la prueba de la demandada, antes relacionada, establece una fuerte duda en la mente de la corte en cuanto a la veracidad de la prueba de la demandante.

"Se ha probado que Tristani pagó los honorarios de la partera que asistió a la demandante y que realizó algunos actos aislados de cariño hacia el menor Alberto Colón, pero la corte es de opinión que la prueba, en conjunto, no ha establecido que dicho menor estuviera en posesión continua del estado de hijo natural reconocido de Tristani, de acuerdo con la prueba robusta y convincente que requiere la jurisprudencia para estos casos."

La parte apelante alega que se han cometido tres errores por la corte inferior. Para los efectos de su discusión estos errores pueden condensarse en uno solo. Se alega que la sentencia dictada no está sostenida por la prueba, que la corte erró al declarar dicha prueba insuficiente, al no considerarla en toda su extensión y al prescindir del ejercicio de una sana discreción.

Como se trata de un caso cuyo resultado final depende de la apreciación de la prueba, y la corte inferior ha declarado que no se han probado los hechos alegados en la demanda, vamos a permitirnos hacer una historia de la legislación vigente hasta hoy en Puerto Rico con respecto al reconocimiento de los hijos naturales, porque entendemos que un estudio del proceso evolutivo de esta legislación en ciertos aspectos puede ayudarnos a la resolución de este caso desde el punto de vista de la prueba aportada.

■■ De acuerdo con las leyes de las Partidas, se entiende por hijo natural "el procreado en barragana o concu-

bina libre o soltera, que sea una sola y no virgen ni viuda honesta, por hombre también soltero que al tiempo de la concepción pudiese casarse con ella.'' Ley 2ª, tít. 14, Part. 4ª; Ley 1ª, tít. 15, d. Part. 4ª, y Ley 8ª, tít. 13, Part. 6ª.

Existe una diferencia entre el derecho romano y el de las Partidas, y esta diferencia consiste en que el primero exige que la concubina haya de habitar en la casa del que la tiene y en la ley de las Partidas no hay ninguna disposición expresa sobre este particular.

La Ley 11 de Toro (Ley 1ª., tít. 5°., lib. 10, Nov. Recop.) dispone que el hijo se diga natural cuando al tiempo que naciere o fuere concebido podía casarse su padre con su madre justamente sin dispensa, con tal que el padre lo reconozca por su hijo, aunque no haya tenido la mujer de quien lo engendró en su casa ni sea una sola.

La investigación de la paternidad estuvo permitida en España mientras permaneció en vigor la Ley 11 de Toro. Vino luego la implantación del Código Civil Español y se introdujo entonces una innovación trascendental en lo que respecta a la admisión de la prueba para justificar la filiación de un hijo natural. La Ley de Bases para la redacción y publicación de dicho Código dice en su Base 5ª. que no se admitirá la investigación de la paternidad sino en los casos de delito o cuando existe escrito del padre en el que consta su voluntad indubitada de reconocer por suyo al hijo deliberadamente expresado con ese fin o cuando medie posesión de estado. En esta misma Base 5ª. se dice que ''se permitirá la investigación de la maternidad'', quedando de este modo el hijo natural en libertad de investigar su origen en lo que a la madre se refiere.

El artículo 135 del Código Civil Español, de acuerdo con la Ley de Bases, obliga al padre a reconocer al hijo natural en los casos siguientes:

1. Cuando existe escrito suyo indubitado en que expresamente reconoce su paternidad.

2. Cuando el hijo se halla en la posesión continua del estado de hijo natural del padre demandado justificada por actos directos del mismo padre o de su familia.

En los casos de violación, estupro o rapto, se estará a lo dispuesto en el Código Penal en cuanto al reconocimiento de la prole.

Comentando estas disposiciones del artículo 135 dice Mucius Scaevola en la página 350, tomo 1º. de su ''Jurisprudencia del Código Civil'':

''Es frecuente el hecho de personas que negando el orden natural, desobedientes a la ley de la sangre, menosprecian el hermoso título de padre y olvidan los deberes congénitos de la paternidad.

''La ley se ha preocupado de hecho tan cruel como repulsivo, y ha concedido al hijo medios para procurar afirmar su personalidad, su estado civil. Pero en este particular no se ha observado la ley, siempre fatal, del progreso; el derecho español ha procedido a la inversa; de la *investigación de la paternidad,* concepto amplio de la ley 11 de Toro, ha retrocedido al taxativo del Art. 135, limitando el reconocimiento forzoso de un hijo por el padre natural a los dos casos en él incluídos. En vez de ir de lo simple a lo complejo, de lo particular a lo general, el legislador español ha seguido procedimiento contrario, apartándose por completo del derrotero de la ciencia jurídica moderna.''

De acuerdo con la ley 11 de Toro el reconocimiento podía ser expreso o tácito. El hijo podía investigar su origen, siendo lícitos todos los medios de prueba inquisitivos de la paternidad. El Código Civil impone limitaciones que no permiten la investigación de los actos que hayan mediado entre los padres y se concreta a los directos y expresos entre padre e hijo. ''No probándose esa relación'', dice Scaevola en la página 357 de la obra citada, ''entre progenitor y procreado, éste sigue siendo *hijo legítimo del acaso y de lo desconocido,* aunque se evidencie que hubo relaciones sexuales entre varón y mujer, y que de ellas nació el reclamante. Servirá tal probanza para el reconocimiento de la madre, mas no para la afirmación de la paternidad. El padre natural—según la ley—es un ente sobrenatural y milagroso, rodeado y envuelto

por las nubes de la incertidumbre, que sólo puede ser conocido cuando se digna descender del trono de la pasión sexual para derramar por piedad o misericordia sobre la cabeza de su hijo el preciado óleo de la filiación.''

El comentarista Manresa se expresa así en las páginas 464-465, tomo 1º. de sus Comentarios al Código Civil Español:

''La inseguridad y misterio en la relación de paternidad, que se aduce para negar su investigación, no es verdadera, puesto que la misma existe en la paternidad legítima, ni tampoco es cierto que pueda pedirse en ninguna de las relaciones jurídicas una certeza absoluta; antes al contrario, no hay en ellas más que una certeza relativa, en la cual reposa una presunción favorable de la ley.

'' 'Esto sucede,' dice con mucha razón Cimbali, 'aun cuando se trata de establecer el vínculo de filiación natural respecto a la madre, de quien puede decirse absolutamente cierto, a veces, el parto, pero no en igual modo absoluto la identidad entre la persona dada a luz y aquella en cuyo favor declara la ley la filiación'. (1) La misma presunción, y salvo prueba en contrario, que rige en la paternidad legítima, debía, pues, valer en la ilegítima respecto a la persona que ha estado en relaciones sexuales con la madre, y esta presunción podía aprovechar al hijo, como así ocurre en algunos países.''

El artículo 189 de nuestro Código, aprobado en 1902, dice así:

''El padre está obligado a reconocer al hijo ilegítimo en los casos siguientes:

''1. Cuando exista escrito suyo indubitado en que expresamente reconozca su paternidad.

''2. Cuando pública o privadamente le tenga por hijo suyo o le haya llamado tal en conversación o se ocupe de su educación y sostemiento.

''3. Cuando la madre fué conocida viviendo en concubinato con el padre al tiempo del embarazo o nacimiento del hijo, o cuando éste haya nacido llevando sus padres relaciones amorosas.''

El inciso tercero del artículo anteriormente copiado introduce una innovación de carácter fundamental, puesto que permite la investigación de la paternidad. Establece este inciso la presunción de paternidad cuando la madre fué cono-

cida viviendo en concubinato con el padre al tiempo del embarazo o nacimiento del hijo. Es, en realidad, una presunción similar a la que se establece en el contrato matrimonial, con la diferencia de que en éste el convenio de las partes sancionado por la solemnidad del matrimonio establece la presunción y en el concubinato la relación entre los padres se establece por medio de prueba. Es decir, para que el tribunal pueda llegar a la conclusión de que existe el concubinato, es necesario que se pruebe que varón y mujer sostienen relaciones maritales y que han cumplido con los demás requisitos exigidos por la ley. En este caso no puede hacerse la declaración de hijo natural sin investigar los actos que han mediado entre los padres, las relaciones existentes entre uno y otro. En los casos de posesión de estado, son los actos directos entre padre e hijo los que pueden ser considerados para determinar la filiación. Además, como cuestión de hecho, la investigación de la paternidad ha venido permitiéndose constantemente en Puerto Rico. La madre ha declarado siempre con toda amplitud sobre las relaciones sexuales con el padre putativo en una acción sobre reconocimiento de hijo natural. El artículo 38 de la Ley de Evidencia declara que todas las personas, sin excepción, fuera de los casos especificados en los artículos 39 y 40, que hallándose en posesión de sus sentidos, pueden percibir y, percibiendo, comunicar sus percepciones a otras personas, son aptas para testigos. El artículo 40 determina los casos en que no se podrá examinar a una persona como testigo y entre esos casos no está comprendido el testimonio de una madre sobre las relaciones sexuales con el supuesto padre de su hijo.

Este artículo 189 del Código Civil, que fué enmendado en 1911, conserva la disposición que establece la presunción de hijo natural cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo. No prohiben nuestras leyes la investigación de la paternidad y, desaparecido este obstáculo, entendemos que los medios de prueba en Puerto Rico son en la actualidad

mucho más amplios que los que existían bajo el Código Civil Español. Nuestra ley actual es mucho más humana y liberal al eliminar esta barrera que el comentarista Scaevola califica de barbarismo jurídico. Veamos lo que dice este comentarista en las páginas 358 y 359, tomo primero, de la obra citada:

"De los actos afirmativos de la posesión de estado de hijo natural nada cabe decir; implican el mero cumplimiento de los deberes que impone al padre el art. 154 del Código: alimentarles, educarles y tenerles en su compañía. El Tribunal Supremo se limita a cumplir estrictamente la ley: negar en los casos de las sentencias respectivas la paternidad, existiendo actos directos del padre, expresivos del reconocimiento de la filiación hubiera sido ilegal, monstruoso; sólo incurriendo en la arbitrariedad pudiera haberse desconocido la filiación, por lo menos en algunas.

"Las otras sentencias, las denegatorias de la filiación, envuelven una iniquidad social, resultante de un barbarismo jurídico (inadmisión de investigar la paternidad.) Claro es que ni los regalos insignificantes ni los actos de mera filantropía tienen virtualidad por sí solos para atribuir a quien los ejecuta la calidad de padre del niño favorecido por unos u otros, porque todos obsequiamos y todos ejercemos alguna vez la caridad; pero tales hechos, unidos a la prueba de las relaciones sexuales con la madre, son signo casi indubitado de la paternidad. Cada uno de tales actos carece de fuerza decisiva para generar una filiación, pero en conjunto tienen potencialidad suficiente para procrearla, y la engendran realmente, si bien luego muera a las manos inexorables de la ley."

El mismo Scaevola, queriendo proporcionar una fórmula para suavizar los preceptos del artículo 135 del Código Civil Español en lo que respecta a la prueba sobre la posesión de estado, dice lo siguiente en las páginas 362 y 363, tomo primero de la Jurisprudencia Civil:

"Al lado de regla tan expansiva como la licitud de todas las pruebas para la justificación de la posesión de estado, existe la dura y cruel de la *impertinencia de la prueba del origen del hijo*, corolario obligado, como confiesa la misma sentencia que lo afirma, del criterio prohibitivo de la investigación de la paternidad.

"Acerca de la segunda, interesa consignar algunas consideraciones que revelen su verdadero valor e impidan una interpretación tan estricta y severa de la misma que conduzca a su propia negación.

"Dada la prohibición de inquirir quién es el padre, podrá estimarse impertinente tal investigación cuando se tome como *fin*, esto es, cuando el demandante se proponga como término de su reclamación averiguar quién fué su progenitor, y la *única* prueba se limite y concrete a tal particular.

"Pero debe estimarse como pertinente en el caso de ser uno de los varios elementos probatorios aportados al debate, porque la demostración del origen del hijo, *unida* a los actos del padre respecto a él, aunque éstos sean tibios, componen en conjunto la sanción más evidente de la paternidad.

"Carece, pues, de valor absoluto la regla de que se habla, debiendo, por el contrario, otorgársele uno muy limitado. Es de aconsejar, siempre que se trate de la filiación natural, encaminar el juicio en el sentido de la prueba de las relaciones entre los padres, y de la paternidad por el varón, como elemento básico, complementándola e integrándola con las demás pruebas abonadas a los actos del padre. Lo primero es demostrar que hay un padre, viniendo después los hechos realizados por él en tal concepto."

Como se ve, el comentarista español opina que debe estimarse como pertinente la investigación de la paternidad, en el caso de ser uno de los elementos probatorios aportados al debate, y termina diciendo que. "lo primero es demostrar que hay un padre, viniendo después los hechos realizados por él en tal concepto."

La paternidad y la filiación surgen de la concepción y el nacimiento. La ley exige ciertas condiciones para que el hecho natural de la concepción y el nacimiento puedan tenerse y considerarse como derecho. Cuando han concurrido estas condiciones el hecho de la filiación queda establecido, pero para que adquiera vida legal es necesaria la formalidad del reconocimiento. La naturalidad del hijo es siempre un hecho; el reconocimiento es la consagración de ese hecho, la solemnidad que proclama que los requisitos que la ley exige han quedado cumplidos, y coloca al hijo en condiciones de demandar la ratificación de los derechos que como a tal hijo le correspondan.

Por ejemplo, una vez establecida la posesión de estado por actos directos y continuos del padre, nos parece que éste no puede despojar al hijo del estado de filiación así adquirido. Como muy bien dice Escriche, "el reconocimiento no es una liberalidad propiamente dicha, sino la declaración de un hecho al cual confiere la ley ciertas ventajas; pero una vez hecha esta declaración de paternidad, adquiere el hijo el estado de filiación del que ya no puede ser despojado."

Estas conclusiones que hemos establecido nos obligan a estudiar el precepto del Código que se refiere a la posesión continua del estado de hijo natural. El adjetivo *continuo,* dice Scaevola, tiene varias acepciones, y en el caso del artículo 135 no puede tomarse en el de "sin interrupción", sino en el de "cosa que sigue a otra", determinándose así con el otro calificativo de "constante", expresivo de perseverancia o repetición de actos. En nuestro concepto la palabra *continuo* debe interpretarse en el sentido de referirse a una serie de actos, a un conjunto de hechos ejecutados por la persona de quien se reclama el reconocimiento, y que sean bastantes, al examinarlos en globo, para constituir la posesión del estado de hijo natural. Una vez que esta serie de actos se ha realizado por un período razonable de tiempo, el padre no debe estar autorizado para revocar por sus actuaciones posteriores el reconocimiento que antes hizo. Establecer un principio contrario equivaldría a autorizar al padre para dejar sin efecto hechos que hubieran podido bastar al hijo para obtener su reconocimiento, si la acción se hubiese ejercitado con anterioridad a la fecha en que quedaron interrumpidas las relaciones que antes mediaron entre ambos.

La jurisprudencia del Tribunal Supremo de España exige una prueba robusta, vigorosa, convincente, que revele con certeza indiscutible los vínculos de sangre que unen al hijo con la persona de quien exige el reconocimiento. La severidad de la jurisprudencia española tiene su explicación en la prohibición de la investigación de la paternidad, que impide que estos vínculos de sangre puedan establecerse con prueba

de las relaciones de carácter íntimo que mediaron entre los supuestos padres. Pero cuando puede establecerse la naturalidad del hijo mediante prueba de la investigación de la paternidad, una vez que el tribunal juzgador considera probado este hecho, la discreción judicial debe ser humana, juiciosa y liberal, sin salirse del marco de la ley, para que el hijo encuentre viable el camino de hacer efectivo el deber de reconocerle que su padre contrae al engendrarlo y de exigir los derechos inherentes a su filiación. La paternidad es un elemento del cual no puede prescindir el juzgador, cuando se ha presentado prueba al efecto, para llegar a una conclusión. De esta prueba pudo prescindirse en España, donde el hijo no estaba autorizado para investigar su origen, y donde "sigue siendo hijo legítimo del acaso y de lo desconocido," como muy bien dice Scaevola, "aunque se evidencie que hubo relaciones sexuales entre varon y mujer, y que de ellas nació el reclamante." Esto no puede ocurrir hoy en España, donde la nueva Constitución Española dispone que la filiación no podrá ser fundamento de privilegio jurídico, impone a los padres los mismos deberes para con los hijos legítimos que los ilegítimos y deja a las leyes civiles la regulación de la investigación de la paternidad. Esto no debe ocurrir en Puerto Rico, donde la investigación de la paternidad no está prohibida por nuestras leyes.

Examinemos ahora la prueba aportada en este caso.

Josefa Colón dice, entre otras cosas, que vivió cuatro años en concubinato con Alberto Tristani, bajo su protección y ayuda; que comenzó a vivir con Tristani desde el año 1922; que durante ese tiempo tuvo un niño que se llama Alberto Colón, al cual se le puso este nombre porque el padre lo dijo así; que durante todo el período de gestación, cuando tuvo en su vientre al niño y cuando nació, vivía con Alberto Tristani, quien iba a su casa a la hora que le parecía, lo mismo de día que de noche, le pasaba los alimentos a su hijo y la protegía y le pagaba la casa; que tenía relaciones carnales con Alberto Tristani y que recibió algunos documentos

escritos del mismo, y un retrato de Tristani que éste le regaló; que cuando dió a luz a su hijo la asistió la comadrona Victoria Carrillo, y que Alberto Tristani pagó los servicios de esta comadrona; que su hijo nació a las 12½ del día 16 de enero de 1924; que Tristani lo vió por la noche, que éste llegó a su casa muy contento con el nene porque deseaba que el niño fuese varón y que estaban allí la Sra. Petrona Suárez y Pellín Fortier, quien llevaba relaciones amorosas con su hermana; que Tristani costeaba los gastos de ropa y los alimentos de su hijo, a quien trataba con cariño y lo atendía como tal; que Pellín Fortier se encontraba en la casa porque llevaba relaciones con su hermana, quien vivía con ella y una hermanita pequeña en la misma casa; que cuando su hermana no conocía a Pellín Fortier la declarante pagaba los $10 de casa y cuando su hermana conoció a Fortier entonces se obligó a pagar la mitad de la casa; que antes de relacionarse con Tristani llevó relaciones con Felipe Maldonado; que esas relaciones duraron hasta el 1920; que vivió como año y medio o dos años con Maldonado y después se separó de él y se fué a casa de su familia; que no tuvo relaciones con ningún otro hombre; que vivió como seis meses con su familia y después fué que conoció a Tristani y que no volvió después a vivir con Felipe Maldonado ni tuvo relaciones con ningún otro hombre; que cuando comenzaron sus relaciones con Tristani vivía en una casita de su hermana Margarita, a quien le dicen Margot; que cuando ella vivía en la calle Protestante la casa era de su hermana y como había incomodidad le dijo a su hermana que vendiese la casa, que Alberto se proponía coger una casa más grande y que él la pagaría; que entonces se mudaron a la calle de Victoria; que cuando vivía en la calle Protestante su hermana no conocía a Pellín Fortier y que al mudarse fué que lo conoció y allí se obligó Fortier a pagar $5 de casa; que en la fecha en que fué concebido y nació su hijo Alberto, era soltera, y que el Sr. Tristani era soltero también. Luego la declarante sufrió un interrogatorio con respecto a las cartas o notas presentadas

como prueba y que dicha declarante dice haber sido escritas por Alberto Tristani. La parte demandada introdujo más tarde prueba testifical para demostrar que la letra de estos documentos no era la letra de Tristani. Declararon en este sentido la demandada, Julia Quesada y Carlos Negrón, encargado de la contabilidad de la casa de Tristani. Ambos testigos declararon que conocían la firma de Tristani y que los documentos ofrecidos como prueba no se parecían ni eran letra de Tristani. La demandante Josefa Colón declaró también que conocía la letra de Tristani y que la letra de los documentos ofrecidos como prueba eran de Alberto Tristani. El juez admitió la prueba para apreciarla en el valor que tuviese.

Petrona Suárez declara, entre otras cosas, que era vecina de Josefa Colón, que vivía al lado de su casa; que conocía a Alberto Tristani, que éste visitaba con frecuencia, de día y de noche, la casa de Josefa Colón, con quien llevaba relaciones amorosas; que Tristani se conducía como padre del niño Alberto, que le llevaba regalitos y proporcionaba los alimentos al niño y a Josefa Colón. La declaración de esta testigo es voluminosa y confusa. Se dice y se desdice, como cuando trata de explicar a qué hora salía Tristani de casa de Josefa Colón y cuando trata de fijar la fecha en que Josefa Colón vino a vivir al lado de su casa. La testigo se envuelve en sus propias redes y no acierta a explicar ni una cosa ni la otra. Petrona Suárez, por la manera de expresarse y por las contradicciones en que incurre, no ha podido dejar bien impresionado el ánimo del juzgador.

Luis Santiago declara, entre otras cosas, que fué empleado de Alberto Tristani desde el año 1922 al 1923; que salía en la guagua o en el carro con éste e iba a casa de Josefa Colón y paraba allí y se quedaba en el carro y Tristani entraba; que así fué como conoció a Josefa Colón; que cuando Tristani le mandaba cualquier papel o alguna carta a Josefa Colón y le decía, "Llévamele a Fulana", él se la llevaba; que dejó el empleo con motivo de un disgusto que

tuvo con Carlos Negrón, empleado de Tristani, y que cuando abandonó la colocación Josefa Colón estaba ya en cinta.

El testigo de la demandada, Carlos Negrón, declaró, entre otras cosas, que Luis Santiago fué despedido de la firma personalmente por él por no cumplir con los deberes de su trabajo, precisamente en la época en que el Sr. Tristani se encontraba embarcado.

Pedro José Fortier declara, entre otras cosas, que es márshal de la Corte Municipal de Ponce, que en el año 1923 entabló relaciones con una joven de nombre Margot Colón, hermana de Josefa Colón, que vivía en esa época en al calle Victoria y que hoy reside en Nueva York; que visitaba la casa frecuentemente, y que al empezar a visitarla ya Josefa Colón vivía hacía bastante tiempo con Alberto Tristani, de quien era amigo; que iba a la casa todas las noches, o muy frecuentemente, donde vivían las dos hermanas y allí se encontraba con Alberto; que la casa era muy pequeña y que le permitía, en una voz natural, oír todo lo que se hablaba; que la casa tenía dos pequeñas habitaciones dormitorio; que una la ocupaba Márgara y la otra Josefa; que él daba $5 a Márgara para que pagase la mitad de la casa; que Alberto pagaba $5 y él pagaba $5; que se encontraban en dicha casa todas las noches; que algunas veces, como eran amigos, Alberto lo invitaba para que se fueran juntos y le dejaba cerca de la esquina donde vivía el testigo y Alberto continuaba porque vivía a otro extremo de allí; que en esto Josefa Colón quedó en cinta; que llegó el momento del parto y recuerda como si hubiese sido ayer el día que nació el niño; que la noche anterior estuvo como de costumbre y encontró allí a Alberto; que se saludaron y al notar que Josefa no estaba, preguntó por ella y el propio Alberto le dijo que Josefa estaba con novedades de parto; que al día siguiente, de medio día abajo, fué a la casa de Josefa Colón y encontró que hacía horas que había nacido el niño; que por la noche fué también y encontró a Alberto, quien le llamaba generalmente don Pello, como algunos amigos llaman al testigo; que Al-

berto dijo, "Don Pello, qué le parece, ya Ud. vino a ver la criatura''; que hablaron acerca de eso, volvieron a entrar en el cuarto donde estuvo con él un ratito y se marchó; que algunas veces el niño se enfermaba y Alberto regañaba a la madre porque le hizo o dejó de hacerle alguna cosa, y le dijo también en su presencia que le avisase a Jaime, refiriéndose al Dr. Jaime Costas; que el niño acariciaba a Alberto y también éste acariciaba al niño y lo cogía; que en eso tuvo diferencias con la hermana de Josefa Colón y se terminaron las relaciones y no volvió a visitar la casa con la frecuencia que lo hacía, si bien el testigo vivía cerca de la esquina de la calle Victoria y algunas veces se encontraba con el niñito, la mamá y la tía y le hablaban del nene y lo acariciaba, y le manifestaban el propósito de marcharse a los Estados Unidos, como así lo hicieron; que algunas veces, encontrándose en la casa el testigo, se acercaba un muchacho de los empleados de Tristani, llamaba a Josefa, ésta salía y le entregaba un sobre o algo así que representaba que era dinero; que no sabe lo que le mandaba ni daba ni nada de esto; que ignora lo que el sobre contenía; que era un sobre y era el semanal lo que contenía, pero que nunca veía el dinero; que Josefa y Margot no recibían más ninguna visita allí, que el testigo sepa. A preguntas del abogado de la parte demandada contestó que sus relaciones con Josefa Colón eran relaciones buenas; que sucedida la muerte de Alberto, Josefa Colón, que estaba residiendo en Nueva York, le escribió diciéndole si podía contar con él y le contestó como cuestión de conciencia que no había que hablar, que estaba a sus órdenes para lo que él sabía, exactamente la verdad y puramente la verdad, como lo está diciendo; que con ese motivo ella vino y el testigo la visitó; que cuando iba el muchacho con el sobre a casa de Josefa Colón sabía que era el semanal lo que él mandaba, pero no la cantidad ni en qué clase de moneda iba.

Francisco Teissoniere declara, entre otras cosas, que vivía al lado de Josefa Colón; que veía a Alberto Tristani llegar

allí muchas veces y que muchas veces fué a esa casa porque era conocido suyo; que Tristani lo invitaba algunas veces a ir a esa casa y sabía que ellos dos se querían; que Tristani vivía allí con Josefa Colón como si fuera su querida; que llegaba en coche, en automóvil, de día, de noche y a cualquier hora; que sabía que Josefa Colón era mujer de Tristani, y que ella estaba en cinta y él le decía: "Voy a tener un nene;" y que lo quería varón y no lo quería mujer; que el testigo se mudó de la casa en que vivía en el año 1923, pero que cree que el niño nació en el 1924. Preguntado por el abogado de la demandada si Josefa y Margot tenían algún nombre, contestó que el padre de estas señoras tenían un negocio de guarapo en la plaza y le decían *Guarapito* y a veces decían: "Ahí viene *Guarapito*," refiriéndose al padre; que a las muchachas no sabe de ningún apodo que se les diera; que Josefa Colón vivió con Pipo Maldonado; que no sabe cuándo terminaron estas relaciones, aunque sí sabe que se dejaron; que vió a Alberto Tristani por allí allá por el año 1920 y en la casa de Josefa Colón en el 1922, y que del año 1920 al 1922 ya el testigo vivía al lado; que Josefa vivía con las hermanitas y otra hermana mayor llamada Margot; que Alberto Tristani iba a casa de Josefa Colón en el 1922; que veía allí muchas veces a Pellín; que Tristani iba allí en coche, en automóvil o en la guagüita de los cigarrillos, de día y de noche, casi todos los días; que muchas veces lo veía temprano, a las ocho o las nueve, y otras veces lo veía a las doce, y que muchas veces lo veía salir, porque el testigo también era medio vagabundo.

Emilio Gazard declara, entre otras cosas, que conoció a Alberto Tristani desde hace como diez y seis años; que es cochero y llevaba a don Alberto a la calle de Victoria a casa de Josefa Colón; que paraba el coche en frente; que a veces lo esperaba una hora y a veces le decía: "Vete y me vienes a buscar;" que esto ocurría allá por el año 1922 al 1923; que recuerda que una noche como a las siete Tristani venía por la calle de la Marina y antes de entrar al Casino le dijo:

"Toma, vete llévamele este encargo a Josefa", diciéndole "No voy allá porque es tarde", y que lo llevó a su casa en la calle de la Marina; que cuando llevaba a Tristani a la casa de Josefa Colón, éste le decía: "Vete y venme a buscar a las dos, a la una;" que cuando Tristani salía de la casa, Josefa Colón venía a cerrar la puerta; que recuerda que en el 1923 llegó un día a la casa de Josefa Colón, y como tenía mucha confianza con él, entró y le dijo: "Ven acá, Emilio, no me dejes de venir a buscar a la 1½;" y estaba Josefa Colón sentada en un sillón; que el testigo le dijo: "Don Alberto, Ud. va a tener una criatura;" que él le contestó: "Así dicen;" y que ella replicó: "Así dicen no, que vas a tener una criatura"; que el testigo dijo: "Voy a que es mujer;" y don Alberto contestó: "Eso yo no lo discuto con nadie", y el testigo se retiró y volvió a buscarlo más tarde; que vió al niño después que nació; que Alberto Tristani lo llevaba a la casa; que paraba el coche y le decía: "Vente para que veas al nene"; que tenía bastante confianza con Tristani y que éste trataba al niño como si fuese su hijo; que Tristani le decía que el niño era su hijo y le mandaba cosas de la botica distintas veces; que le dió alcoholado para que se lo llevara a ella para que bañara al nene. A preguntas del abogado de la demandada contestó que lo único que puede decir es que Alberto le decía que el niño era hijo de él, pero que no puede asegurar que el niño fuera de Alberto Tristani; que no llevaba a más nadie a la casa y que no ha visto otros hombres allí.

Emilio Márquez declara que es agente de negocios; que conoció a Alberto Tristani desde muchachito y que conoció a Josefa Colón en un negocio que tuvo con ella de una casa que le vendió; que tenía una casa en la calle Vives, la que vió Josefa Colón, diciéndole que fuera donde Albertito Tristani; que fué donde Albertito, trataron la casa por $450 con solar, que Tristani le dijo que no tenía nada más que $250 y le daría una obligación por $200 si el testigo la aceptaba; que entonces fué al banco, propuso la negociación y se la

aceptaron; que vendió la casa a nombre de Josefa Colón y pagada por Alberto Tristani, quien le dijo que tenía un hijito con ella; que no recuerda cuándo ocurrió eso; que cree que hace como tres o cuatro años más o menos; que hizo hincapié para conseguir el descuento; que habló con Toñito y Toñito descontó la obligación; que le dijo que eso lo hacía porque no quería dejar a ese chiquito en la calle, que era su hijo; que el declarante le manifestó que tenía otra casa de mayor cantidad y le contestó que no podía comprarla porque había comprado recientemente un solar en la calle de la Villa y entonces compraría primero esa pequeña y la echaría después para atrás; que la manifestación que hizo Tristani de que tenía un hijo con Josefa Colón y que no quería dejar ese hijo en la calle la hizo tan públicamente que el testigo estaba en el bufete de Albizu Campos y Albizu, si estuviera en Puerto Rico, tal vez corroboraría lo que pasó; que moralmente vendió la casa a Alberto y legalmente a Josefa Colón.

Felipe Maldonado declara entre otras cosas que conoce a Alberto Tristani y a Josefa Colón; que siempre lo vió lleno de salud, andando como cualquier otra persona; que Josefa Colón vivía precisamente frente a la entrada de su casa, en la calle de los Petardos, y que distintas veces vió allí a Alberto Tristani; que lo vió llegar en coche, en dos o tres ocasiones, bajando por sus propios pasos; que eso ocurría de noche mayormente; que de día lo veía pasar por allí pero nunca lo vió que entrara a la casa y de noche lo vió varias veces. A preguntas del abogado de la demandada contestó que conoce a Josefa Colón desde el año 1920, que el Felipe Maldonado que vivía con esta Josefa Colón es el mismo declarante; que la conocía íntimamente. A preguntas del abogado de la demandante dice que desde el 1921 cree que no se ha querido más nunca con ella; que desde el 1921 no tuvo que ver nada más con ella; que vivió con ella alrededor de ocho o diez meses.

Victoria Carrillo declara que es viuda de Casals; que vive en Ponce y su profesión es comadrona; que como tal

comadrona asistió a la señora Josefa Colón, allá por enero del año 1924; que Alberto Tristani le pagó los servicios que le prestó a la señora Colón; que se los pagó él mismo en persona; que tiene su diploma de comadrona; y que en su carácter de profesional asistió a la Sra. Josefa Colón, y le presentó la cuenta a Tristani; que ella fué a su oficina, le presentó el 'recibo y Tristani le pagó. Hasta aquí la prueba practicada por la parte demandante. Veamos ahora la evidencia ofrecida por la demandada.

La demandada, Julia Quesada, declara que nunca tuvo conocimiento de que Alberto Tristani tuviera algún hijo; que Alberto nunca se lo dijo y siempre se lo decía todo; que allá por el año 1922 ó 1923, Alberto Tristani sentía siempre mareos, un mal en la vista que no veía, así como mosquitas que le pasaban por delante de la vista y veía doble; que eso lo tenía lo más inquieto; que también padecía de un enfriamiento que le daba por los pies y le seguía por la espalda, y le decía que se sentía muy mal y se recobraba un poco y después se iba a su trabajo; que sentía también dolores de cabeza; que Alberto Tristani falleció en el año 1928 en Filadelfia; que embarcó para dicha ciudad con el Dr. Clavell y una *nurse* porque iba muy malo.

Nicolás Jiménez, testigo de la demandada, declara entre otras cosas que Josefa Colón vivía en compañía de una hermana, Margot, y que iban hombres a su casa; que a estas hermanas se las conocía con el nombre de "Las Guarapito"; que el testigo recuerda haber ido varias veces a esa casa; que fué con un cochero, Atilano, en algunas ocasiones y en otras con otros chóferes; que esto ocurrió allá por el mes de febrero del año 1923; que la amistad del testigo con Josefa Colón era en calidad de pasajero; que era una mujer donde se podía ir en calidad de pasajero, de visita, y que después salían con uno, y hacían vida marital con cualquier hombre; que si mal no recuerda fué una o dos veces a la casa con Atilano, sin que pueda precisar la fecha; que no puede decir exactamente cuántas veces fué; que una vez fué

con un amigo suyo llamado Pedro Martínez, de San Juan; que la mayor parte de las veces iba solo; que Pedro Martínez era un amigo suyo, carpintero, de San Juan, y que no sabe si está en San Juan o si es vivo o es muerto; que en la actualidad es carpintero de la compañía Sucn. de Alberto Tristani; que no es cierto que él haya dicho a Leopoldo Tormes que ese hijo es hijo de Alberto Tristani y que él sepa que Josefa Colón se quiso como concubina con Tristani públicamente y que ese hijo es el producto de esas relaciones.

El testigo de la demandada, Atilano Garay, declaró entre otras cosas que es cochero; que conocía a Josefa Colón allá por el año 1923; que acostumbraba ir con pasajeros muchas veces, entrada la noche, a la casa de dicha Josefa Colón, y como a veces no era posible por los vecinos y demás, le avisaba a ésta y ella se iba a pie a casa de una señora llamada Marcelina; que a esta casa iban las dos hermanas; que llevó allí a Alberto Tristani; que estos hechos ocurrieron del 1922 al 1923; que llevó también a casa de Josefa Colón varias personas, comisionistas de la Isla, quienes le preguntaban si había algo bueno que el testigo conociera; que a la casa de Josefa Colón iban amigos de la Isla, como Alberto Tristani, quien iba también; que estas personas entraban en la casa, salían a la hora y el testigo las dejaba allí y después iba a buscarlas; que dichas personas le decían que las llevara a casa de "Las Guarapito", que eran buenas muchachas para pasar el rato; que estas personas iban a ocuparse allí y que quiere significar, al decir ocuparse, roce carnal; que no recuerda el nombre de las personas que llevó a la casa de Josefa Colón; que llevó a Alberto y a Nicolás Jiménez, con quien salió de paseo una noche; que no recuerda ninguna otra persona; que Marcelina es una morena que tiene una casa de negocio.

El testigo Antonio Iglesias declara entre otras cosas que pasaba por la casa de Josefa Colón y la veía allí con su hermana y que siempre había hombres en dicha casa; que salió a pasear con Josefa Colón y la hermana; que eso fué por

el 1923, la Fiesta de Cruz, una cosa así; que no recuerda el día de la semana ni la fecha del mes; que esto ocurrió del 1922 al 1923; que salieron a pasear como para la playa, a los baños de mar, a Los Meros, y que iban también para Quintana. Preguntado si esto era un paseo para mirar el campo y los árboles, contestó: "Por algo era que yo paseaba;" que tuvo contacto carnal con Josefa Colón; que salió como de 7½ a 8 y que fué con ella a Los Meros y a los baños de Quintana; que llegó a los baños de Quintana como a las 9½ y que estaba allí un viejito celador cuyo nombre no recuerda; que el automóvil que usaba era un automóvil público de la propiedad del testigo.

Antonio García declara entre otras cosas que es cochero; que del 1922 al 1923 fué a casa de Josefa Colón a llevar unos muchachos como a las 9½; que esos muchachos le dijeron que a las 11 ó a las 11½ volviera a buscarlos y que fué a buscarlos a esa hora; que tan pronto como entraron en la casa cerraron la puerta; que Josefa Colón y sus hermanas las llamaban "Las Guarapito"; que recuerda que fué un viernes que llevó a estas personas a la casa de Josefa Colón, del 1922 al 1923, pero que no sabe el año exacto ni el mes; que lo único que sabe es que fué un viernes que llevó a esa gente.

Esta es la prueba aportada por ambas partes, con excepción de la prueba de impugnación y pericial que nos queda aún por examinar.

En sus conclusiones de hecho, la corte inferior declara que no se ha probado el hecho de que Alberto Tristani viviera en concubinato con Josefa Colón, pero da como probado el hecho de que esta última, allá por los años 1922 al 1924, fué la querida de Alberto Tristani y que éste la visitaba con alguna frecuencia por la noche.

Dice la corte inferior que la demandante, Josefa Colón, con anterioridad a Tristani, se quiso con Felipe Maldonado, y que aun cuando llevaba relaciones con Tristani era visitada en su casa por otros hombres. "Antonio García y Atilano Garay", continúa diciendo la corte *a quo*, "declararon que

para los años 1922 a 1923, acostumbraban llevar pasajeros a la casa de la demandante, que vivía con su hermana Margot, a las que llamaban 'Las Guarapito', y que la reputación que tenían era de que admitían hombres para ocuparse con ellas, habiendo declarado Garay que entre las personas que llevó varias veces estaba Tristani. Asimismo Antonio Iglesias declaró que para los años 1922 a 1923, él vivía cerca de la demandante y que salió a pasear con ella en el año 1923, a los baños de mar de Los Meros y a los baños de Quintana, y que tuvo contacto carnal con la demandante.''

Y añade la corte inferior: ''Es cierto que tanto la demandante como su testigo Fortier negaron estos hechos al declarar en *rebuttal,* pero la demandante es parte interesada, y en cuanto al Sr. Fortier, la corte no pone en duda la buena fe con que declaró en este caso, pero no puede olvidarse de que él era el querido de la hermana de la demandante, contra la cual se hizo parecida imputación que a ésta.''

La corte inferior no pone en duda la buena fe con que declaró Pedro Fortier, pero no puede olvidarse de que éste fué querido de una hermana de la demandante. La prueba demuestra que Pedro Fortier llevó relaciones amorosas con una hermana de Josefa Colón, por algún tiempo, cuando Tristani también sostenía relaciones con la demandante. Estas relaciones del testigo Fortier con la hermana de Josefa Colón, que vive hoy en Nueva York, terminaron algún tiempo después de haber nacido el niño cuya paternidad se atribuye a Alberto Tristani. Cuando Fortier declaró, ya estas relaciones amorosas habían terminado desde hacía algunos años. Nos parece que las relaciones de Fortier con una hermana de la demandante, amén de ser demasiado remotas, no pueden servir de base para tachar su testimonio de interesado. La corte *a quo* admite la buena fe de Pedro Fortier al producir su testimonio; pero al apreciar la prueba, da crédito a los cocheros que declararon sobre la reputación de Josefa Colón y no tiene en cuenta la declaración de Fortier. Un testigo que declara de buena fe puede equivocarse, puede demostrar

interés en el éxito favorable de la parte que ofrece su testimonio, y hasta incurrir en exageraciones. Todo esto es humano, y puede y debe ser tomado en consideración por el juzgador, pero si el testigo altera los hechos hasta el extremo de faltar a la verdad, es evidente que no declara ni actúa de buena fe. El testimonio de Fortier está en abierta contradicción con el testimonio de los testigos de la demandada. Si éstos dicen la verdad, Fortier ha faltado a ella, y viceversa. Vamos a permitirnos transcribir en toda su integridad la declaración de Pedro Fortier, impugnando la prueba de los demandados sobre la reputación de la demandante:

"DEMANDANTE:
"Se alega aquí que en el año mil novecientos veintidós al mil novecientos veintitrés . . . —Se ha dicho aquí que un cochero de apellido . . . —un cochero de nombre Atilano Garay . . .
"Lo conozco.
" . . . . Otro de nombre Antonio García . . .
"TESTIGO:
"Si es alias Juana Díaz, lo conozco también.
"DEMANDANTE:
"¿Está Antonio García aquí presente?
La persona aludida le es presentada al testigo.
"Exacto—Juana Díaz.
—Otro de nombre Antonio Iglesias. . . .
"También lo conozco.
—Se ha alegado por ellos que en el año mil novecientos veintidós y en el año mil novecientos veintitrés, Josefa Colón y su hermana Margara Colón eran conocidas en la comunidad donde vivían como mujeres de mal vivir, como rameras, que se iba a su casa como a una casa de negocio; que ellos llevaban a mucha gente allí de noche, las esperaban o se iban y después volvían a buscarlas a altas horas de la noche, y que salía también Josefa Colón en otras ocasiones a casa de una tal llamada Marcelina, que iba allá, y otras veces en automóvil se iban de paseo con ellas. ¿Del conocimiento que tiene usted con respecto a Josefa Colón en la casa que vivió allí en la calle Victoria, usted puede decir a la corte si eso es verdad?
"Absolutamente falso; es una infamia de extremo a extremo. Josefa Colón—sobre todo Josefa Colón—ha sido una mujer de una conducta intachable en cuanto a eso. Ella, al tiempo de vivir con Al-

berto Tristani, y antes, porque tengo entendido que ella fué antes, mucho tiempo antes, de Pipo Maldonado, su conducta fué intachable. Soy vecino de allí, hombre que por ser soltero voy y vengo, frecuento, tengo amigos, hablo con ellos y con la infinidad de amigos de Alberto Tristani, que lo eran al propio tiempo míos, y jamás, en ningún momento, he tenido conocimiento de eso porque me lo hayan dicho ni lo haya visto yo con mis propios ojos. En cuanto a la hermana, Margot Colón, varía en algo; es mayor que ella y antes fué mujer que tuvo muchos maridos y no estoy seguro si tropiezos de esa índole; pero en el tiempo que yo estuve yendo a la casa, que fueron 3 años, próximamente, tampoco, porque no lo hubiera permitido yo, y porque yo, modestamente, en mis escasos recursos, le llenaba sus necesidades; y tenía hermanitas pequeñas a las cuales me consta que guardaba para ellas mucho, mucho respeto; y ninguno de estos títeres tuvo ocasión de. . . .

"DEMANDADA: Voy a solicitar que se elimine la palabra *títeres*; aquí el testigo no es el márshal de la corte municipal; es un testigo nada más.

"JUEZ: Que se elimine.

"DEMANDANTE: Sí, que se elimine.

"DEMANDADA: Quiero hacer constar que el testigo está confesando un delito federal que es aplicable a Puerto Rico.

"DEMANDANTE: ¿Cuál?

"DEMANDADA: *Fornication,* resuelto por el Tribunal Supremo.

"JUEZ: Bueno, ésa es otra cuestión.

"DEMANDADA:

"¿Usted tiene interés en este asunto o no tiene interés?

"TESTIGO:

"Personalmente, absolutamente ninguno—una cuestión de conciencia.

"¿En estos días dónde va usted a pasar sus días?

"¿Mis días?

"¿Usted no va a visitar a Josefa Colón?

"Ni una sola vez de tarde; he ido durante la noche a verla, alguna vez, porque es persona que conozco desde hace mucho tiempo.

"¿Pero usted estuvo viviendo con Margot Colón y tiene algún agradecimiento por ello?

"¿Agradecimiento?

"¿Con Margot, la hermana de Josefa?

"Pues agradecimiento personalmente ninguno; eso terminó.

"¿Terminó?

"Sí, señor.

"¿Quién fué que le escribió a Josefa Colón que Alberto Tristani había muerto, no fué usted?

"Lo ignoro en absoluto—no, señor, yo no.

"¿Está seguro de eso?

"Seguro, absolutamente seguro."

Hasta aquí el testimonio de Pedro J. Fortier, producido por la demandante para rebatir las declaraciones de Nicolás Jiménez, Atilano Garay, Antonio Iglesias y Antonio García.

La declaración de Nicolás Jiménez fué impugnada por el testigo Leopoldo Tormes, quien declaró que un día se encontró con Jiménez que es su amigo, buena persona, y que éste le dijo que el hijo de Josefa Colón era hijo de Alberto Tristani, y que estaba dispuesto a venir a la corte a sostenerlo. Jiménez negó que tuviese esta conversación con Tormes, agregando que habló con éste dos días antes de verse este caso; que Tormes le preguntó si iba a declarar y trató de averiguar su declaración; que el testigo le dijo en parte su declaración y que la respuesta que le dió Tormes fué: "Parece mentira que te vayas a favor del dinero y en contra del pobre;" y que el testigo le respondió que eso era asunto de su conciencia; que tuvo una discusión con Tormes, sosteniendo el testigo que nunca había tenido esa conversación con él, y que Tormes le dijo: "Yo me voy y el consuelo que me queda es que entre una mentira dicha por ti en la corte, y otra por mí, la mía vale más."

La corte admitió como prueba una opinión emitida por el juez Todd en un caso de divorcio incoado por Magdalena Rodríguez contra Nicolás Jiménez. En esta opinión dice el Juez Todd que la forma nerviosa y agitada en que declaró Nicolás Jiménez llevó a su ánimo la convicción de que estaba mintiendo, y así lo hizo constar en las notas que tomó el día del juicio.

Es de notarse que estos testigos que declaran que iban y llevaban hombres a casa de Josefa Colón, no mencionaran ninguna persona residente en Ponce con excepción de Alberto Tristani. Nicolás Jiménez dice que fué con un hombre llama-

do Pedro Martínez, de San Juan, de quien no sabe si es vivo o muerto. Atilano Garay manifiesta que llevó a Nicolás Jiménez y a Alberto Tristani, y a varios comisionistas de la isla, y que no recuerda los nombres de las personas que llevaba a la referida casa. Si se aceptan como ciertas las declaraciones de estos testigos, hay que convenir en que Alberto Tristani, que, según la corte inferior admite, daba dinero a su querida la demandante, satisfizo los servicios de la comadrona que la asistió, pagaba la casa en unión del Sr. Fortier, y, agregamos nosotros, le compró una casa y la visitaba con frecuencia, toleraba pacientemente que su querida estuviese al servicio de otros hombres, con los cuales tendría que encontrarse en sus frecuentes visitas a la casa. El testigo Atilano Garay dice que entre las personas que llevaba a la casa se encontraba Alberto Tristani. No parece natural que un hombre tenga una querida y la atienda en la forma en que atendía Tristani a Josefa Colón, y luego permita que se desarrollen en la casa que paga las escenas de que hablan los testigos de la demandada.

El testigo Antonio Iglesias dice que salió a paseo con Josefa Colón y su hermana; que por algo era que paseaba; que fueron a Los Meros y a los baños de Quintana, y que tuvo contacto carnal con la demandante. Cuando el testigo dice que por algo era que paseaba, parece dar a entender que utilizó el paseo como un medio para llegar a la realización del acto carnal. Si es verdad que la demandante recibía hombres en su casa como dicen los testigos de la demandada, Antonio Iglesias no tuvo necesidad de sacarla a paseo para tener contacto carnal con ella. Pudo haber realizado sus deseos en la propia casa de la demandante.

Hemos leído y examinado cuidadosamente toda la prueba que desfiló ante la corte inferior, y después de haber comparado el testimonio de Pedro J. Fortier con las declaraciones de los testigos de la demandada, nos explicamos que el juez no pusiese en duda la buena fe de Pedro Fortier al declarar, pero no nos podemos explicar que se haya descartado su de-

claración por el hecho de haber sostenido relaciones amorosas con una hermana de la demandante con algunos años de anterioridad, y que se haya tomado en cuenta lo declarado por los testigos de la demandada sobre la reputación de la mencionada demandante. Basta examinar fría y serenamente esta prueba para que surja en el ánimo una sensación de duda muy acentuada acerca de la veracidad de estos testigos, cuyo testimonio está en conflicto con la declaración de Pedro Fortier.

Es cierto, como dice la corte, que la demandante, con anterioridad a Tristani, llevó relaciones amorosas ilícitas con Felipe Maldonado. La misma demandante confesó estas relaciones a preguntas de su propio abogado. Agrega la corte que la testigo Petrona Suárez, de la propia demandante, declaró que aun en vida de Tristani la demandante se fué a vivir a Nueva York y hacía más de dos años estaba por allá, y tenía otro hijo con otro hombre. Esta conclusión de la corte no aparece justificada por la prueba. Aunque se trata de un hecho que, de haberse realizado, ocurrió años después de haber sido engendrado el niño Alberto Colón, como la corte inferior lo tomó en consideración para poner en duda la moralidad de la demandante, vamos a permitirnos transcribir lo que dijo Petrona Suárez:

"DEMANDADA: Josefa Colón, ¿cuánto tiempo ha estado viviendo en los Estados Unidos?

"Dos años.

"¿Con quién vivió allí en los Estados Unidos, si Ud. sabe?

"No sé.

"¿Ella tuvo allí algún hijo?

"Ahora, que haya cogido su esposo, ahora; pero cuando se fué, fué sola—eso es particular."

Esta es toda la prueba que aparece en el récord, con respecto a esta conclusión que establece la corte inferior. No afirmamos ni negamos, pero sostenemos que estas manifestaciones de Petrona Suárez no justifican en modo alguno la conclusión a que ha llegado la corte inferior.

Que la corte inferior dió gran importancia a esta prueba lo demuestran las siguientes conclusiones que copiamos a continuación:

"Si tomamos en consideración todos los hechos relacionados con la vida de la demandante que antes que con Tristani se quiso con Maldonado y mientras llevaba relaciones con Tristani dejó a su hijo en Puerto Rico con su hermana y se fué para Nueva York y allí tuvo otro hijo con otro hombre, y allá vivía en octubre 20 de 1928, cuando falleció Alberto J. Tristani en Filadelfia, hay que convenir en que la corte no puede dar crédito a la alegada moralidad de la demandante y que la prueba de la demandada, antes relacionada, establece una fuerte duda en la mente de la corte en cuanto a la veracidad de la prueba de la demandante."

En cuanto a la prueba pericial ofrecida para demostrar la impotencia de Alberto Tristani, al tiempo de la concepción del niño Alberto Colón, la corte inferior declara que ha hecho caso omiso de esta prueba al establecer sus conclusiones. La corte hace constar, además, que aun cuando ha resuelto el caso por otros fundamentos que los alegados en la defensa especial, le merecen absoluto crédito las declaraciones de los testigos peritos, Drs. Mariano Riera y Luis E. Clavell, a quienes considera incapaces de preparar lo que en los alegatos de la demandante se llama una coartada médico-apócrifa, y aprovecha esta oportunidad para llamar la atención a los letrados de que deben abstenerse en sus alegatos de hacer imputaciones de carácter personal a los compañeros, y limitarse a una discusión serena y ecuánime de los hechos y la ley envueltos en el caso.

Respetamos el criterio de la corte en cuanto a la credibilidad que le merecen los Drs. Riera y Clavell. En cuanto a la prueba pericial hay que convenir en que resulta de las más difíciles y complicadas para llevar una convicción al ánimo del juzgador. Esta prueba por los factores que en ella intervienen es recibida con cautela por los tribunales de justicia, que, conocedores de la fragilidad humana, saben que aun los peritos más rectos se sienten inconscientemente in-

fluenciados por la parte que ofrece su testimonio y que usual-
mente paga con liberalidad sus esfuerzos y servicios. No
obstante, esta prueba pericial, por la naturaleza de la misma,
ha merecido nuestra más seria y cuidadosa consideración.

El Dr. Mariano Riera declara que allá por julio y agosto,
1923, fué consultado por Alberto Tristani, quien le dijo que
hacía algún tiempo que venía padeciendo de sífilis; que se
había hecho un examen de la sangre algunos años antes y
había dado resultado positivo; que se había sometido a un
tratamiento hacía algún tiempo y que ya se habían presentado
algunas manifestaciones, y que quería someterse a un trata-
miento en forma. Dice aquí el perito que los síntomas de
la dolencia que padecía Tristani le sugirieron la posibilidad
de un diagnóstico sífilis cerebro-espinal; que estos síntomas
fueron anestesia en ciertas regiones, especialmente en las
piernas, debilidad en las piernas y en los músculos de las
piernas, dolores neuríticos en las piernas, cierta desigualdad
en las pupilas, la pupila derecha más pequeña, caída del pár-
pado, también del mismo lado, tosis del párpado; y además
las manifestaciones de Tristani, quejándose de que hacía
algún tiempo sus funciones sexuales estaban abolidas, que
había absoluta impotencia, una debilidad para llenar las fun-
ciones sexuales, y que esto era una de las cosas que le pre-
ocupaban mucho. Basado en estos síntomas el Dr. Riera
llegó a la conclusión de que Tristani padecía una sífilis cere-
bro-espinal, según pudo comprobar en el curso de la enfer-
medad.

No vamos a transcribir aquí toda la declaración del Dr.
Riera porque es muy extensa y llenaría muchas páginas.
Vamos a limitarnos a la prueba que se refiere a la impotencia
atribuída a Tristani.

Se ha probado el hecho de que Alberto Tristani murió de
una meningitis de origen sifilítico y que la sífilis cerebro-
espinal fué la causa contribuyente de su muerte.

Dice el Dr. Riera a preguntas del abogado de la demandante, que la impotencia sexual es inherente a la sífilis cerebro-espinal, que es uno de los síntomas de la enfermedad.

Copiamos del interrogatorio lo siguiente:

"Dígame, doctor ¿puede existir la . . . . —esta enfermedad denominada tabes dorsal, sin que exista la impotencia, sin que se afecte...

"En un tanto por ciento puede existir, especialmente en sus comienzos, en las últimas fases es que. . . .

"Sucede o no sucede con frecuencia, doctor, en su principio, que un taboparético, en vez de haber disminuído su potencia sexual, la ha aumentado?

"Hay casos que en su principio.

"Dígame, doctor, ¿y un sifilítico . . . —la sífilis por sí sola produce impotencia para la procreación?

"La sífilis no en absoluto."

\* \* \* \* \* \* \*

"¿Es posible, doctor, que cuando usted empezó a tratar a Alberto Tristani la primera vez, o la segunda vez, haya tenido Alberto Tristani contacto carnal con alguna mujer?

"Como los síntomas que presentaba eran subjetivos, y en estos casos puede existir o no existir esa debilidad, depende, como le dije, de la forma en que se presente en cada individuo; y yo tomé por verdad las manifestaciones de él, de que le era imposible—manifestaciones de él, como que le era imposible. Lo tomé como el dicho de él, de que se le mejoraran esos síntomas, y, además, los otros que tenía."

Entre juez y perito se desarrolló el siguiente diálogo:

"Dígame, doctor, ¿hay alguna forma en que un médico puede comprobar las manifestaciones que le hace un paciente de que sufre de impotencia sexual?

"Bueno, yo creo que si . . . —Yo creo que no.

"La enfermedad de que sufría este paciente suyo era una enfermedad sencilla o seria?

"Seria.

"¿De las más serias que se conocen, por sus resultados?

"Sí, de las más serias, por sus resultados finales.

"Y entre los síntomas que él le manifestó a usted era ése de la impotencia?

"Era de los que más le preocupaban a él.

"¿Usted puede hacer recuerdo de si esa impotencia era absoluta o que tenía dificultad para realizar el acto carnal?

"Me dijo que no podía.

"¿Eso fué en el mil novecientos veintitrés, o fué. . . .

"Tan pronto como él empezó a tratarse; fué en el veintitrés."

Como hemos visto, el Dr. Riera nos dice que en los casos de sífilis cerebro-espinal uno de los síntomas es la impotencia sexual. El Dr. Potts nos dice en la página 411 de su obra "Nervous and Mental Diseases", que en los casos de sífilis del cordón espinal, la pérdida del poder sexual es usualmente uno de los tempranos síntomas. El Dr. Campbell nos dice en la página 293 de su obra "Diseases of the Nervous System", que el poder sexual es usualmente grandemente disminuído o perdido cuando la tabes dorsalis está completamente desarrollada, pero que en sus comienzos puede ser temporalmente aumentado. El Dr. Potts nos dice en la página 420 de la obra citada que en los casos de demencia paralítica o paresis, se manifiesta, en los principios de la dolencia, un aumento de deseos y vitalidad sexual. La paresis afecta el cerebro, la tabes afecta la espina dorsal. En el caso de Tristani, se trata de una tabo-paresis, es decir, de una sífilis cerebro-espinal.

El Dr. Riera dice que Tristani le dijo que la impotencia sexual había aparecido, pero que no recordaba con exactitud cuándo.

De modo que no se expresa con exactitud cuándo fué que dijo Tristani que había comenzado la impotencia de que se quejaba. El tratamiento del Dr. Riera comenzó en julio o agosto de 1923. El niño Alberto Colón nació en 16 de enero de 1924. Ha debido ser concebido en el mes de abril de 1923. El mismo Dr. Riera nos dice que la debilidad sexual puede presentarse o no en este caso, quizá refiriéndose a los comienzos de la enfermedad. Cuando Tristani visitó por primera vez a Riera, la enfermedad no se había desarrollado completamente. Tristani murió en 20 de octubre de 1928, cinco años y meses después de la concepción del niño Alberto

Colón y de la primera entrevista de Riera con el paciente. El Dr. Riera nos dice que se basa exclusivamente en las manifestaciones de Tristani con respecto a la impotencia sexual, por ser éste un síntoma de la sífilis cerebro-espinal. El Dr. Luis Clavell, quien acompañó a Tristani a Filadelfia, en substitución del Dr. Riera, nos dice que Tristani fué examinado por el Dr. Rose, una celebridad médica, y por el Dr. Clark, habiendo todos calificado la dolencia de sífilis cerebro-espinal. Nos dice además que se firmó la certificación de defunción por el Dr. Clark en presencia del testigo. En esta certificación, que firmó el Dr. Clark en presencia del Dr. Clavell, se dice que Tristani murió de meningitis de origen sifilítico, que esta meningitis duró un mes, y que la causa contribuyente fué la tabo-paresis que duró cuatro años. Aunque realmente no demos importancia a esta manifestación, consignada en presencia de uno de los médicos que asistió a Tristani, no deja de ser un elemento de prueba que pueda tomarse en cuenta en la apreciación de los hechos. Si la tabo-paresis duró cuatro años, y Tristani murió en octubre de 1928, la enfermedad empezó en 1924. Esta manifestación se hizo en momentos en que no había ningún litigio pendiente ni interés alguno que pudiera influir en la manifestación del Dr. Clark. Es verdad que el Dr. Riera nos dice que diagnosticó la dolencia que aquejaba a Tristani de sífilis cerebro-espinal en julio o agosto de 1923, pero aun admitiendo como cierto lo dicho por el Dr. Riera, y no lo consignado en la partida de defunción por el Dr. Clark, tendremos siempre que convenir en que la tabo-paresis estaba por lo menos en sus comienzos cuando Tristani visitó al Dr. Riera.

La corte admite como probado el hecho de que Josefa Colón era la querida de Alberto Tristani. Querida, en el diccionario de la Academia Española, es la mujer que tiene relaciones amorosas ilícitas con un hombre. Se ha probado además que Tristani salía a altas horas de la noche del hogar de Josefa Colón. Esta declara que para el año de 1923, cuando quedó embarazada, tenía contacto carnal con Tris-

tani, quien era un hombre fuerte y potente. También hay que tener en cuenta la actitud de Tristani cuando nació el niño, y el hecho de haber pagado los servicios de la comadrona que asistió a la demandante. Con esta prueba no es posible establecer la conclusión de que Tristani era impotente al tiempo de la concepción del niño. Sus propios actos revelan lo contrario.

El testimonio de la madre con respecto a las relaciones sexuales con el padre putativo es evidencia admisible en nuestros tribunales de justicia, donde ha venido permitiéndose esta prueba desde hace muchos años. El hecho de que el supuesto padre haya muerto no hace inadmisible la prueba, como sostiene el abogado de la demandada. Esta es una circunstancia que puede ser tenida en cuenta por el juzgador, unida al interés natural que se supone tiene toda persona en su propia causa. La siguiente cita de Corpus Juris demuestra la liberalidad a que se ha llegado sobre el testimonio de la madre:

"En la ausencia de un estatuto que requiera corroboración, el jurado puede declarar que el demandado es el padre del niño basado en el testimonio único de la madre, con tal de que crea que su testimonio es cierto. Cuando, sin embargo, se ha arrojado alguna duda sobre la credibilidad de este testimonio, como cuando se presenta prueba de relaciones sexuales con otro hombre al tiempo de la concepción, se ha sostenido que su testimonio no corroborado es insuficiente; pero aun en tal caso su testimonio puede ser suficientemente positivo para sostener un veredicto." 7 C. J., págs. 994 y 995.

Entre las autoridades que aparecen en las notas al pie de esta cita, figura el caso de *Michael* v. *State,* 57 Ind. 520, 108 N. E. 175, donde varios testigos declararon que habían tenido contacto carnal con la demandante al tiempo de la concepción del hijo. Copiamos de la opinión de la corte en este caso: "Ella declaró positivamente que el apelante es el padre de su hijo y que no ha tenido contacto carnal con ningún otro hombre durante el mes de abril de 1911. Su testimonio fué suficiente para sostener el veredicto. El

jurado ha debido creerla a ella y no a los testigos, y como nosotros no tenemos derecho a pesar la evidencia, el veredicto no debe ser perturbado por la razón de que es insuficiente la prueba.''

El testigo de la demandante, Francisco Teissoniere, dice que el padre de Josefa Colón tenía un negocio de guarapo en la plaza y le decían "Guarapito", y que no sabe ningún apodo atribuído a las muchachas. El testigo Leopoldo Tormes declara que a todos les decían "Guarapito" porque el padre vendía guarapo en la plaza del mercado y todo el mundo conocía con este nombre a los varones y a las hembras.

Los testigos de la demandada dicen que a Josefa Colón y a su hermana les llamaban "Las Guarapitos.''

Se presentaron también como prueba cuatro notas o papeles dirigidos a Josefa y firmados por Alberto, y un retrato de Tristani que la demandante dijo le había sido regalado por el primero. En cuanto a las notas, Josefa Colón declaró que conocía la letra de Alberto Tristani y que la letra de las notas era la misma de Tristani. La demandada Julia Quesada y su empleado Carlos Negrón declararon que conocían la letra de Tristani y que no había parecido alguno entre su letra y la letra de las notas. La corte inferior no hizo pronunciamiento alguno sobre estos documentos. En vista de este conflicto en las declaraciones de estos testigos, nos hemos abstenido de considerar esa prueba.

Acaso nos hemos extendido demasiado en el examen y la relación de la prueba. Creemos, sin embargo, que era necesario hacerlo así, dada la naturaleza del caso y las conclusiones establecidas por la corte inferior. Opinamos que la filiación de Alberto Colón ha quedado satisfactoriamente establecida. La corte a quo declara probado que Josefa Colón era la querida de Alberto Tristani allá por los años de 1922 a 1924, o sea, durante el tiempo en que fué concebido el niño Alberto Colón. Declara además la corte a quo que Tristani visitaba con alguna frecuencia a Josefa Colón por la noche, que le daba dinero y pagaba la casa en unión

del Sr. Fortier; que Tristani pagó los honorarios de la comadrona que asistió a Josefa Colón en su alumbramiento y que realizó algunos actos aislados de cariño hacia el menor Alberto Colón. La corte inferior nada dice sobre la casa que Alberto Tristani compró a Josefa Colón. La declaración del vendedor de esta casa, Emilio Márquez, no aparece contradicha y produce la impresión de ser un testimonio desinteresado. Este testigo declara que Alberto Tristani, cuando le pagó la casa, le dijo que tenía un hijito en Josefa Colón. La demandante declaró también que al niño se le puso el nombre de Alberto porque "el papá dijo que se le pusiera ese nombre." Estos hechos, unidos a los demás detalles y circunstancias diseminados en la prueba, nos parecen bastantes para declarar a Alberto Colón hijo natural reconocido de Alberto Tristani.

La ley, cuando varón y hembra viven en concubinato y nace un niño, establece la presunción de hijo natural, puesto que impone al padre el reconocimiento del hijo. En el presente caso no se ha probado que Tristani viviera con la demandante en la misma casa. Se probó que Josefa Colón era su querida. La querida, como la concubina, mantiene con su querido o concubino relaciones sexuales. En ambos casos se sostienen relaciones amorosas ilícitas. No se establece presunción legal en los casos en que no se prueba el concubinato; pero una vez establecidas las relaciones amorosas ilícitas, surge una presunción moral tan difícil de rebatir como en los casos de concubinato. Esta presunción, corroborada y complementada con otras pruebas, como lo ha sido en el presente caso, adquiere un valor probatorio que tiene que producir una impresión poderosa en el ánimo del juzgador.

Hemos estudiado la jurisprudencia establecida por este Tribunal Supremo en lo referente a la prueba de posesión de estado. Esta corte en sus decisiones aprecia los elementos de prueba que se han presentado en cada caso y su valor probatorio. Esta jurisprudencia es aplicable a aquellos casos

en que se ventila la posesión de estado independientemente de las relaciones íntimas que han mediado entre la madre y el padre putativo; pero cuando las relaciones sexuales han quedado establecidas y surge en la mente del juzgador la presunción de la paternidad, esta presunción, corroborada y robustecida por otros actos del padre, puede ser suficiente para que se obtenga y recaiga una declaración de hijo natural. Sería injusta una ley que una vez demostrado que hay un padre, no facilitase los medios de obligarle a asumir las responsabilidades contraídas con el hijo que engendró. Ese no pudo ser el pensamiento del legislador; ése no puede ser el espíritu de las disposiciones del artículo 193 del Código Civil.

Por las razones expuestas opinamos que *debe revocarse la sentencia apelada y declararse a Alberto Colón hijo natural reconocido de Alberto J. Tristani con todos los derechos inherentes a su filiación. Asimismo debe decretarse la nulidad de la sentencia dictada por la Corte de Distrito de Ponce con fecha 8 de diciembre de 1928 declarando única y universal heredera de Alberto J. Tristani a la demandada Julia Quesada y Mandri vda. de Tristani y madre de Alberto J. Tristani, sin especial condenación de costas.*

VOTO DISIDENTE DEL JUEZ ASOCIADO SR. ALDREY CON EL CUAL ESTÁ CONFORME EL JUEZ ASOCIADO SR. WOLF.

La demanda en este caso fué presentada por Josefa Colón como madre de su hijo menor de edad Alberto Colón, está dirigida contra la madre de Alberto J. Tristani como única heredera suya, y tiene por objeto que su hijo sea declarado hijo natural reconocido de Alberto J. Tristani, fundándose en dos motivos: 1, que fué engendrado y nació viviendo su madre en concubinato con Alberto J. Tristani, siendo ambos solteros; 2, en que dicho menor se halla en la posesión continua del estado de hijo natural de su alegado padre, justificada por actos del mismo. También se interesa la declaración de nulidad de la declaratoria de herederos hecha a favor de la madre de Tristani.

La sentencia dictada en este pleito por la corte inferior declaró sin lugar la demanda y fué interpuesta esta apelación.

El concubinato es la convivencia de un hombre y de una mujer, solteros, en la misma casa como si fueran marido y mujer. Es un estado parecido al del matrimonio pero sin la celebración del mismo. Como dijimos en el caso de *Medina* v. *Sucn. Bird,* 30 D.P.R. 158, el concubinato a que alude el Código Civil se refiere a la condición de vivir el hombre y la mujer lo mismo que marido y mujer, sin estar realmente casados; sin que sea suficiente para que exista el concubinato que un hombre tenga una mujer en una casa y la visite frecuentemente si el hombre tiene su hogar propio independiente. Como dijo este tribunal en el caso de *Gerena* v. *Sucn. Suau,* 36 D.P.R. 170, cuando un hombre vive en distinta casa que una mujer con quien tiene relaciones sexuales no existe concubinato aunque la visite en algunas ocasiones.

En el presente caso aparece de la prueba que Alberto J. Tristani y Josefa Colón, madre del menor en cuyo nombre se demanda la declaración de filiación, no vivían juntos en una casa como marido y mujer sino que en la fecha en que el niño fué engendrado y en la de su nacimiento Tristani vivía y tenía su hogar en la casa de su madre, viviendo Josefa Colón en otra casa en compañía de una hermana que era querida de otro hombre; y que Tristani visitaba a Josefa de noche y se retiraba a eso de la una de la madrugada para su hogar. Esa prueba, que fué unánime, no demuestra la existencia de un concubinato entre ellos sino que Josefa Colón era la querida de Tristani.

En la opinión que sirve de fundamento a la sentencia de la mayoría de este tribunal al revocar la sentencia de la corte inferior se admite que Tristani no vivía en concubinato con la madre del menor y se dice que Josefa Colón era la querida de Tristani; y que aunque eso no establece una presunción legal de paternidad cuando no se prueba el concubinato, una vez establecidas las relaciones amorosas ilícitas surge una presunción moral tan difícil de rebatir como en los

casos de concubinato. En otras palabras, las relaciones de un hombre con su querida se quiere equipararlas al estado de concubinato con presunción que no existe en la ley.

El secreto de la paternidad ha hecho que la ley haya tenido que acudir a presunciones en cuanto a los hijos y por esto los nacidos en el matrimonio tienen el concepto de hijos del marido y los que son engendrados y nacidos durante el concubinato tienen el concepto, en nuestro derecho de hijos del concubinario, por la similitud que hay entre ambos estados, pero la ley no ha equiparado los hijos de una querida con los de una concubina. La ley ha llegado hasta a admitir que los hijos nacidos de un concubinato son los hijos del concubinario pero no ha ido más allá ni, por tanto, a declarar que los hijos que tiene una querida son los hijos del hombre que con ella tiene relaciones sexuales. ¿Quién puede en la ley presumir quién es el padre de los hijos de una mujer que no vive con el hombre bajo el mismo techo? Por esto, del hecho de que un hombre tenga relaciones sexuales con una mujer como querida suya no surge presunción alguna, ni aun moral, desconocida para la ley. El concubinato es de fácil prueba, pero en este caso no se probó. Para el concubinato como para el matrimonio la prueba con respecto al estado legal de los hijos es solamente el matrimonio o el estado de concubinato, y en uno u otro caso no es necesario probar relaciones sexuales porque la ley las supone. Por tanto, la prueba de actos sexuales de un hombre con una querida no crea presunción alguna de paternidad en cuanto al hombre.

La prueba del estado continuo de hijo natural de un hombre es más difícil. En varias ocasiones hemos declarado que esa prueba debe ser robusta y convincente; y se comprende que así debe ser porque por ella se trata de introducir en una familia y en una herencia a persona que no es parte de ella hasta que por sentencia se declare que es hijo natural del padre que se le imputa. Y en casos como el presente, en que ha muerto la persona a quien se atribuye la paternidad, la prueba ha de considerarse con cautela porque

debe tenerse presente que se hace difícil, si no imposible, a los herederos del alegado padre contradecir las palabras y actos atribuídos al presunto padre. *Torres* v. *Sucn. Caballero*, 39 D.P.R. 729. Esto no quiere decir que después de muerto el presunto padre no pueda declararse a. una persona hija natural suya por los actos y manifestaciones del presunto padre sino que prueba de esa clase debe ser examinada y apreciada con mucho cuidado.

Las relaciones de Tristani y de Josefa comenzaron en 1922; en 16 de enero de 1924 nació el niño en cuyo nombre se demanda; esas relaciones terminaron en 1924 y Tristani murió en octubre de 1928, por lo que el niño tenía un año de edad al concluir esas relaciones.

Alberto J. Tristani pagaba la mitad del alquiler de la casa que vivía Josefa Colón y pagó una pequeña casa que ella compró; actos que no implican reconocimiento del niño. que nació sino el sostenimiento y bienestar de su querida. El haber pagado los honorarios de la partera que asistió a Josefa tampoco es por sí mismo un acto de reconocimiento de la paternidad del niño. Algunos testigos declararon que Tristani les manifestó que el niño que tuvo Josefa Colón es hijo suyo. La corte inferior, que oyó declarar a los testigos y vió la manera en que lo hicieron, estaba en mejores condiciones que este tribunal para apreciar la credibilidad de ellos, y a nuestro juicio no se ha demostrado un error manifiesto que justifique la revocación de la sentencia que dictó. En casos como el presente generalmente no revocamos la conclusión de la corte inferior, según dijimos en *Mercado* v. *Sucn. Mangual*, 35 D.P.R. 423, en el que se citaron los casos de *Castro* v. *Quiñones*, 29 D.P.R. 744, y de *Montalvo* v. *Montalvo*, 25 D.P.R. 858. El hecho de que la corte inferior no pusiera en duda la buena fe con que declaró el testigo Fortier, aunque diciendo que nó podía olvidar que era el querido de la hermana de Josefa y el hecho de que al prestar su declaración en el juicio ya habían terminado esas relaciones, no es por sí solo motivo para revocar la sentencia;

y tampoco lo es que la corte manifestase que Petrona Suárez declaró que Josefa Colón había tenido un hijo en Nueva York después de terminar sus relaciones con Tristani, cuando esto no aparece de su declaración, pues la manera en que ella contestó, según los autos, pudo llevar la impresión a la corte de que el hecho era cierto aunque eludía decirlo.

Con la prueba que se presentó respecto de actos y manifestaciones de Tristani y con la apreciación que de ella hizo la corte inferior, entiendo que no debió ser revocada la sentencia apelada.

No entro en la prueba de reputación, y en igual manera, como la corte inferior, no considero la prueba de los médicos.

Estoy autorizado para decir que el Juez Sr. Wolf está conforme con esta opinión.