Juana Estela, como madre con patria potestad sobre su menor hijo Esteban Camilo Estela, demandante y apelante, *v.* Sucesión de Benito Medraño, compuesta de su universal heredero Benito Medraño, demandada y apelada.

Núm. 6874.—*Sometido:* Mayo 7, 1936. *Resuelto:* Mayo 21, 1937.

*V. M. Fernández,* abogado de la apelante; *Arturo O'Neill,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

■ El presente es un pleito de filiación basado en los incisos 2 y 3 del artículo 125 del Código Civil (edición de 1930). Según enfocamos el caso, la suficiencia de la prueba relativa al supuesto concubinato durante el embarazo de la madre es la única cuestión que necesita ser considerada. El juez de distrito, fundándose en cierto *dictum* o en ciertos *dicta* en la opinión disidente emitida en el caso de *Colón* v. *Sucesión Tristani*, 44 D.P.R. 171, resolvió que la prueba no había establecido el concubinato, toda vez que el padre putativo, aunque pasaba la mayor parte de sus momentos de ocio junto a su querida, tenía su hogar o guardaba las apariencias de una morada distinta, en la casa de un hijo casado, por razones que se coligen de la prueba.

Este tribunal nunca ha dicho que el concubinato no puede coexistir con la tenencia de una morada separada o de una morada separada ostensible donde el amante guarda su ropa y su cama, toma la mayor parte de sus comidas, y donde, al estar enfermo, recibe a sus amigos. Por el contrario, en el caso de *Méndez* v. *Martínez*, 24 D.P.R. 241, 253, dijimos (bastardillas nuestras):

"El artículo 452 del Código Penal que antes regía en Puerto Rico castiga al marido que tuviera una manceba dentro de la casa conyugal *o fuera de ella con escándalo. Estas citas por sí indican que no es un elemento necesario de un estado de concubinato que el hombre tenga que tener una residencia más o menos exclusiva con la mujer. No creemos que es necesario para que exista un estado de concubinato que el hombre no deba tener otra residencia que la de la mujer.* Como dijo la Corte Suprema de Louisiana, semejante condición no es indispensable en un estado de matrimonio ni lo era para un estado de concubinato. *Successión of Jahraus, infra.* La Enciclopedia Jurídica Española tiene un corto artículo sobre el concubinato en donde se dice que para que constituya concubinato la unión que existe entre un hombre y una mujer debe ser duradera, continua y persistente.

"Louisiana, que también indirectamente hereda su ley de Roma,

tenía también un precepto legal semejante al artículo 452 del Código Penal para España y Cuba, según el cual es un delito por parte del marido tener una concubina en la casa conyugal, o en algún otro sitio, notoria y públicamente. El estatuto ha sido citado en el caso de *Ledoux* v. *Her Husband,* 10 La. Ann. 663.

''El artículo 1481 del Código Civil de Louisiana dispone que aquellos que han vivido juntos en notorio concubinato son incapaces para hacerse donaciones de bienes inmuebles.

''En el caso de *Sucesión de Jahraus,* 114 La. 456, un hombre casado sostenía a una mujer secretamente y la corte, por tanto, resolvió que el artículo 1481 no era de aplicación, pero en el curso de la opinión la corte se expresó en estos términos:

'' 'El demandado niega que jamás han existido relaciones ilícitas entre él y la testadora, y que en caso de que la corte resuelva que tales relaciones realmente existieron, él niega que fueran de la naturaleza que se les atribuye, o, en otras palabras, que constituyeran el hecho de ''vivir juntos en notorio concubinato,'' de donde resulta la incapacidad que determina el artículo 1481.

'' '.    .    .    .    .    .    .    .

'' 'Los ilustrados abogados del demandado fundan el argumento en las palabras ''haber vivido juntos.'' Palabras que dicen deben ser tomadas en su sentido ordinario en la interpretación de un estatuto; y el sentido corriente de las palabras ''haber vivido juntos'' es ''haber morado o residido juntos''; y por tanto los concubinos deben haber vivido juntos en el sentido de haber morado o residido juntos para que pueda ser aplicable a ellos el artículo 1481.

'' 'No podemos adoptar esa interpretación. *El residir juntos con frencuencia acompaña al concubinato, pero no es una característica esencial. Puede haber concubinato, un concubinato público a la vez, o sin eso, lo mismo que puede haber matrimonio sin ello.* Es cosa que acompaña de modo invariable al matrimonio pero que no es esencial; su falta no anularía el matrimonio. No creemos que deba decirse que la ley no tendrá en cuenta un concubinato en tanto se abstengan los concubinos de vivir realmente juntos. El objeto de la ley es la relación permanente de vivir juntos como hombre y mujer sin ser casados, y si esa relación se sostiene públicamente queda cumplida la condición del artículo 1481, *aunque las partes no vivan juntas.* Según la interpretación alegada un hombre podría poner una casa a una mujer, visitarla allí regularmente, crear una familia con ella, pagar sus cuentas, educar a sus hijos y de palabra o por su conducta, o en ambas formas, dar a conocer sus relaciones ilícitas

con ella y, sin embargo, no estar comprendido el caso dentro de las prescripciones del artículo 1481, en tanto residiera en otra parte. Repetimos que no creemos que sería procedente dar esa interpretación al artículo 1481.'

"En el caso de *Succession of Filheil*, 119 La. 998, la corte diferenció el caso de Jahraus con respecto a lo que constituirá una relación secreta entre las partes y declaró que existía un estado de concubinato entre ellas cuando los hechos, dejando a un lado la cuestión de ser notoriamente conocidos, eran muy parecidos a los del presente caso. El razonamiento de la corte en el caso de Jahraus que hemos citado, fué aceptado.

"En el caso Jahraus, supra, página 49, se cita una autoridad francesa que define el concubinato en un sentido parecido a como se define en dicho caso. En vista de los antecedentes de Puerto Rico y la ley que hemos podido hallar en las jurisdicciones que tienen condiciones parecidas a las de Puerto Rico, *no vacilamos en llegar a la conclusión de que cuando un hombre sostiene una casa separada para una mujer* por un período de años y va a visitarla, permaneciendo con ella por tres o cuatro días a la vez, *semejante relación constituye un estado de concubinato.*"

De la opinión emitida en el caso de *Medina* v. *Sucesión de Bird,* 30 D.P.R. 158, 160, tomamos el siguiente extracto (bastardillas nuestras):

"La corte inferior declaró probado que no hubo prueba de concubinato y con esta declaración de la corte estamos en completo acuerdo. Hubo cierta prueba, principalmente de la propia demandante, de haber tenido ella relaciones carnales con Jesús Bird Arias a la fecha de la concepción del niño Agustín Medina, pero no hubo prueba satisfactoria de que este hombre y esta mujer vivían juntos en forma marital alguna, o como marido y mujer. El concubinato a que alude el Código Civil se refiere a la condición de vivir juntos lo mismo que marido y mujer sin estar realmente casados. No es suficiente que un hombre coloque a una mujer en una casa y frecuentemente la visite, *especialmente* si él tiene un hogar propio independiente como la prueba tiende a mostrar."

En el caso de Sucesión de Bird este tribunal tenía ante sí un caso en que la corte de distrito resolvió que no había concubinato. Este tribunal estuvo plenamente de acuerdo con la conclusión de la corte de distrito. La referencia que

incidentalmente se hizo al hecho de que el padre putativo en el caso de Sucesión de Bird tenía "un hogar propio independiente" servía evidentemente de contrapeso como circunstancia adicional en un caso en que la sentencia apelada hubiera sido confirmada aún si el padre putativo no hubiera tenido "un hogar propio independiente". La referencia así hecha difícilmente puede ser considerada como una repudiación del *ratio decidendi* del caso de *Méndez v. Martínez,* supra.

La parte pertinente de lo que resolvimos en *Gerena v. Suau,* 36 D.P.R. 170, se sintetiza en el sumario en la siguiente forma:

"Cuando la prueba no tiende a demostrar que las relaciones entre el padre putativo con la madre del supuesto hijo o hija natural fuera similar o muy cercana al estado marital sino a aquélla en que un hombre mantiene una querida (*mistress*) no cabe sostener el reconocimiento obligatorio, de un hijo tenido por la mujer contemporáneamente con tal relación, fundado tal reconocimiento en que los padres vivían en estado de concubinato."

En dicho caso la demandante comparecía representada por su tutor debido a que su madre, Dolores González, "tenía intereses opuestos a su citada hija." La corte dijo (pág. 174, bastardillas nuestras):

". . . Los hechos del caso de *Méndez v. Martínez,* supra, eran mucho más fuertes. En dicho caso el padre putativo vivía prácticamente en vida marital con la madre de los supuestos hijos naturales. En el presente caso, aceptando como ciertas todas las declaraciones de los testigos del demandante, *la prueba no demuestra nada semejante a un estado de vida marital.* Hubo prueba tendiente a demostrar que Bartolo Suau pagaba el alquiler de la habitación ocupada por Dolores González; que la visitaba con mucha frecuencia, saliendo de la casa tarde en la noche o temprano en la madrugada, es decir, de 2 a 3 de la mañana. No hubo prueba de que él se quedara con ella toda una noche. No hubo prueba de que él comiera con ella. No hubo prueba de esa clase de vida en que un hombre y una mujer constituyen un hogar juntos sin haber sido unidos solemnemente por los lazos del matrimonio, *y no hubo nada que se acercara siquiera*

*a tal estado de cosas.* Se admitió y reconoció por la corte que aunque Bartolo Suau *no tenía lo que puede llamarse un hogar, sin embargo, dormía en su propio establecimiento y comía con su hermano.*

"La idea de un estado de concubinato, según indicamos en el caso de *Medina* v. *Sucesión de Bird, et al.,* 30 D.P.R. 158, es *una relación similar o muy cercana al estado marital. Tal vez podría ser un poco menos que el estado marital y. estaríamos dispuestos a reconocer un concubinato, pero un estado de concubinato debe diferenciarse de una relación en que un hombre meramente mantiene una querida (mistress).* Es cierto que Bartolo Suau pasaba muchas horas con Dolores González, *pero no hallamos nada en la prueba que eleve la relación sostenida por Bartolo Suau con Dolores González a un estado de concubinato.* Aunque uno o dos testigos llegan a tal conclusión, los autos no demuestran nada parecido a que *era de conocimiento público un estado de concubinato entre estas dos personas.*

"También hay la declaración de Bartolo Suau, a la que nos referiremos más tarde, *en la cual él niega enfáticamente haber vivido en un estado de concubinato con nadie y su negativa está sostenida por las declaraciones de otras personas.*"

En su opinión la corte también comenta luego el hecho de que Dolores González no había ocupado la silla de los testigos, y manifestó que no se había explicado por qué no se la había puesto a declarar.

Al igual que en el caso de Sucesión de Bird la corte consideraba la existencia de una residencia separada meramente como circunstancia que tenía que ver con la cuestión de concubinato *vel non* al igual que hubiera considerado cualquier otra circunstancia que hubiera podido ser de importancia en relación con dicho punto. El caso no sirve de autoridad para la contención de que el tener una residencia separada es incompatible con la existencia de un estado de concubinato. Si pudiera considerarse como autoridad para tal contención entonces, hasta ese extremo, debe resolverse que ha sido revocada por el caso de *Góñez* v. *Palmieri,* 50 D.P.R. 457.

En el presente caso la corte de distrito llegó a la conclusión de que Juana Estela era la querida pero no la concubina de Benito Medraño. Por tanto, no es necesario que reseñemos en detalle el testimonio para establecer la

relación de amante y querida. Creemos que la prueba también establece un estado de concubinato aún bajo el criterio conservador sostenido por una escasa mayoría de este tribunal, conforme el mismo estaba constituído en la época en que se resolvió el caso de *Gerena* v. *Suau*. Si estamos en lo cierto al decir esto, no es menester que discutamos las distinciones sutiles existentes entre una mujer bien tenida por un amante y una concubina. No importa cuál sea la diferencia, en caso de que la haya, la palabra "concubinato" tal cual ha sido usada por nuestra Asamblea Legislativa en el inciso tercero del artículo 125 del Código Civil, no es necesariamente sinónima del *"concubinatus"* del derecho romano.

· No es necesario que un hombre y su querida se hagan pasar ante el público como marido y mujer para que se establezca un concubinato. Tampoco es necesario que las relaciones sean notorias. El único requisito de la ley es que "la madre sea *conocida* viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo." En caso de la muerte del padre, dentro de un mes o dos del nacimiento del niño, basta con que la madre haya sido conocida viviendo en concubinato con el padre durante el embarazo y hasta el momento de su muerte. *Estela* v. *Sucesión Medraño,* 44 D.P.R. 149, 151.

Éste no es el caso de un hombre que alquila una habitación para una mujer, paga sus gastos y la visita con más o menos frecuencia con el objeto de tener relaciones sexuales, más bien que sociales. No podría decirse que "la prueba no demuestra nada semejante a un estado de vida marital" como cuando "un hombre y una mujer constituyen un hogar juntos sin haber sido unidos solemnemente por los lazos del matrimonio." Medraño no "mantenía meramente una querida." No puede decirse que no hay nada en la prueba "que eleve la relación" sostenida por Medraño y su querida "a un estado de concubinato" si, conforme se admite por la mayoría en el caso de *Gerena* v. *Suau,* un estado de concubinato puede ser "un poco menos que el estado marital."

Con un año o dos de anterioridad a la muerte de la esposa de Medraño, ocurrida el 11 de febrero de 1929, Juana Estela visitaba frecuentemente la casa de Medraño, donde era útil a la esposa de éste. Ella no estaba empleada como sirvienta y no recibía remuneración alguna, aunque aceptaba regalos ocasionales de Medraño y su esposa. Fué durante este período que el interés de Medraño en Juana llegó al grado que explica la rapidez con que se desarrolló la situación una vez ocurrida la muerte de la señora Medraño. Medraño era un hombre amante de su hogar, aparentemente devoto de su esposa, y se sentía grandemente apenado por la pérdida de la compañía de ésta. Un hijo, que estaba comprometido para casarse, adelantó la boda con el propósito de tomar una casa en San Juan y de constituir un nuevo hogar para sí y para su padre en un nuevo ambiente. En el ínterin Medraño le dijo a Juana que necesitaba una mujer para que lo cuidara y que deseaba que ella fuera esa mujer. Entonces le explicó la situación al cuñado de Juana, que era donde ésta vivía para aquella época, y el cuñado le dijo a él que tenía que buscarle otro sitio a Juana puesto que él (el cuñado) tenía cinco hijos y no quería darles malos ejemplos. Medraño entonces hizo arreglos con otro cuñado que vivía muy cerca de la casa de Medraño en Santurce, y en febrero 18 Juana se fué a vivir a la casa de este cuñado. Unas tres semanas después Medraño y el cuñado de Juana, a indicaciones de Medraño, tomaron un apartamiento en San Juan, donde todos vivían juntos como una sola familia durante el tiempo que Medraño podía convenientemente pasar en el apartamiento. Medraño y el cuñado pagaban $35 mensuales por el apartamiento. De esta suma Medraño pagaba $15 y el cuñado $20.

Para aquella misma época el hijo estaba casado y había alquilado una casa en San Juan en la cual Medraño tenía una habitación y por lo menos durante algún tiempo tomó allí sus comidas o la mayor parte de ellas. Él estaba sujeto a una dieta que consistía de vegetales, sopas, cereales,

ponches de leche y huevos. La suegra del hijo preparaba los alimentos de Medraño, le llamaba para el desayuno por las mañanas y ocupaba una habitación contigua a la de éste. De ordinario, le oía cuando él regresaba por las noches y declaró que éste tenía por costumbre regresar como de diez a once. En una ocasión al despedirse de Juana le explicó que no deseaba que le echaran de menos en la casa de su hijo. Hubo prueba tendente a demostrar que a medida que el tiempo transcurría él pasaba más y más de sus momentos de ocio junto a Juana y menos de ellos en la casa de su hijo. Este testimonio también tiende a demostrar que durante algún tiempo con anterioridad a su última enfermedad él pasaba prácticamente todo su tiempo, noche y día, fuera de sus horas de trabajo, junto a Juana y que había hecho que la morada de ésta fuera su hogar, a pesar de que aún tenía su habitación y la mayor parte de su ropa en la casa de su hijo. Por razones que ya hemos enunciado, no creemos necesario dar énfasis a este punto.

Medraño era el conserje principal de una institución bancaria. Su inmediato subalterno, Juan Crespo, era su más íntimo amigo y confidente. Poco después de iniciarse el nuevo *modus vivendi* de Medraño, Crespo notó una mejoría en el aspecto mental y personal de Medraño y le dió bromas sobre esto último. Antes de fines de marzo Medraño le dijo a Crespo que tocara a la puerta de la habitación número 45 de la Calle de la Luna. Así lo hizo Crespo y tuvo unos momentos de charla con Juana Estela y su hermana. Luego Medraño traía a Juana al banco durante las noches, donde ella se sentaba y le esperaba hasta que él terminaba su trabajo nocturno. En una de estas ocasiones Crespo bromeó a Medraño sobre la perspectiva de la llegada de un nuevo heredero, y Medraño le contestó que pronto tendría que empezar una nueva cuenta de ahorros. En junio o julio la señora Crespo obsequió a su esposo con un hijo y Medraño y Juana Estela visitaron el hogar de éstos. Medraño también utilizaba a Crespo como mensajero en ocasiones en que le man-

daba frutas y otros objetos a Juana Estela. Cuando .el banco envió a Medraño al hospital, Medraño le pidió a Crespo que entregara a Juana $6 a la semana mientras permanecía en el hospital y Crespo le hizo la primera entrega precisamente el día en que murió Medraño. Esto fué unos dos meses antes del nacimiento del niño.

Hasta el momento de su última enfermedad Medraño se tomó mucho interés en el hecho de que nuevamente iba a ser padre. Cuando Juana quedó en cinta y tuvo un dolor en el vientre, él la hizo examinar por el médico de la familia. Si la criatura resultaba ser varón su nombre sería Camilo. Si resultaba ser hembra sería Remedios. Antes de su última enfermedad Medraño había suministrado a Juana algunas de las cosas necesarias para su alumbramiento. Él no la trataba con tacañería. Él no hacía alarde de sus nuevas relaciones en presencia de los familiares de su finada esposa ni de sus amigos, ni en presencia de su hijo, de su nuera, ni de la suegra de éste, pero la prueba en su totalidad no deja lugar a dudas en nuestras mentes de que él y Juana Estela vivían en un estado de concubinato.

*La sentencia apelada debe ser revocada y en su lugar este Tribunal dictará otra declarando a Esteban Camilo Estela hijo natural de Benito Medraño con derecho a llevar el apellido de su padre y con todos los demás derechos que la ley pueda conferirle por razón de su status como tal hijo natural, sin especial pronunciamiento de costas.*

El Juez Asociado Señor Wolf disintió.*