ANA MARÍA ORTIZ, menor de edad, representada por su madre con patria potestad, DOLORES ORTIZ, demandante y apelante, *v.* SILVESTRE DRAGONI, demandado y apelado.

Núm. 8297.—*Sometido:* Junio 4, 1941. *Resuelto:* Junio 24, 1941.

*Frank Torres*, abogado de la apelante; *R. Hernández Matos*, abogado del apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Este recurso tiene por objeto revisar la sentencia que desestimó la demanda de filiación en este caso, predicada en los números 2 y 3 del artículo 125 del Código Civil (ed. 1930), que prescribe que el padre está obligado a reconocer al hijo natural: (2) "Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia;" o (3) "cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo."

Los cuatro errores que señala la apelante en realidad se reducen a dos. Los tres primeros imputan el de no estimar que la prueba presentada es suficiente para sostener la demanda, y el cuarto el haber actuado la corte sentenciadora movida por pasión, prejuicio y parcialidad.

La naturaleza de los errores señalados requiere un resumen de la prueba.

Declararon por la demandante, su madre Dolores Ortiz, su tío Guillermo Ortiz, y Manuel Borrero, Marcolina Heredia y Juan Vázquez. Por el demandado, declaró Lorenzo Dragoni.

Dolores Ortiz declaró que es soltera y que también lo es el demandado Silvestre Dragoni. Que conoció al demandado en el año 1934 en el barrio Maragüez, de Ponce, mientras trabajaba en la casa de doña María Dragoni, tía de Silvestre. Que el demandado también vivía en Maragüez, a alguna dis-

tancia de la casa de doña María. Que el demandado la enamoraba y le ofrecía matrimonio, y una noche, estando la testigo en su habitación, dejó la puerta abierta y penetró el demandado, realizando actos carnales con ella; que estos actos se repitieron cuatro o seis veces, pero al quedar encinta la testigo, no volvió más el demandado donde ella; que tres meses antes de dar a luz se trasladó a la casa de su hermana Alejandrina Ortiz y durante esos tres meses el demandado no fué a verla; habiendo nacido la niña en la casa de su citada hermana. Que ocho días después de nacida la niña, el demandado vino a verla y le dejó $2, y desde entonces no ha vuelto donde la testigo. Que la testigo ha atendido siempre a las necesidades de su hija.

Guillermo Ortiz declaró que es hermano de Dolores, que conoce al demandado, que éste en dos ocasiones le manifestó que llevaba amores con su hermana y que pensaba casarse con ella; que a los ocho días de nacida la demandante, el demandado vino a verla y le dejó $2. Contrario a lo que declaran Dolores Ortiz y Marcolina Heredia, este testigo aseguró que en esa ocasión, es decir, cuando el apelado vino a conocer a su hija a los ocho días de nacida, su hermana Dolores no se hallaba en la casa, sino en el barrio Maragüez; que las única personas que estaban allí en aquel momento eran Alejandrina Ortiz, hermana de Dolores y del testigo, la niña, otra señora que suponemos sea Marcolina Heredia, y el testigo. Que después el demandado no volvió más; que un día, estando el testigo en casa de Francisco Taboada, frente a Tomás Monllor, don Lorenzo Dragoni, tío del demandado, llamó a una cuñada del testigo y le entregó $10 para alimentos de la niña Ana María Ortiz.

Manuel Borrero declaró que es padrino de la demandante; que un día se encontró con el demandado y el testigo lo trató de "compadre" y le dijo que él debía hacer algo por la niña y por la madre, contestándole el demandado que le había ofrecido $100 y que ella no los había querido y que no le daba nada más.

Marcolina Heredia declaró que como a los ocho días de nacida la demandante, la testigo se hallaba visitando a Dolores Ortiz y llegó allí el demandado y quiso ver a su hija Ana María Ortiz, y pasando a la habitación, la cogió y la acarició, tratándola de "mi hija", diciendo: "Mi visita es corta porque tengo que andar unas diligencias." Que puso la niña en la cama y dejó a la madre $2 para alimentos de aquélla.

Esta testigo declaró con absoluta precisión que su visita tuvo lugar el 6 de abril de 1937, a pesar de que al declarar lo hacía el 30 de enero de 1940 y al preguntarle cómo podía recordar con tanta precisión la fecha de la visita, dijo que porque lo sabía, que no la había apuntado, que la tenía en la mente.

Juan Vázquez sólo declaró que conoce a Dolores Ortiz, y que es soltera.

De las declaraciones reseñadas y de la certificación de nacimiento de la niña consistió la prueba de la demandante.

La del demandado consistió, como hemos dicho, en la declaración de Lorenzo Dragoni, quien negó haber enviado cantidad alguna a la demandante.

¿Es la prueba reseñada suficiente para sostener una sentencia de filiación por cualquiera de las dos causas alegadas?

El único acto tendente a demostrar el estado de hija natural de la demandante consistió en la visita que le hiciera el demandado ocho días después de su nacimiento, el haberla acariciado y dejádole $2 para alimentos, sin que desde entonces volviera a ocuparse más de la niña ni de la madre. Es cierto que el testigo Manuel Borrero declaró que se encontró en una ocasión con el demandado y lo trató de "compadre" y le dijo que hiciera algo por la demandante y por su madre, y que el demandado le contestó que le había ofrecido $100 a Dolores Ortiz, que ésta los había rehusado y que nada más le daría. Aparte de que de esa declaración no puede determinarse si la oferta de los $100 se hizo antes del nacimiento de la niña y en ese caso no podría considerarse como un acto

de reconocimiento, la existencia de esa oferta es en extremo dudosa, pues si en la ocasión antes aludida el demandado, a los ocho días de nacida la niña, entregó a la madre $2 para alimentos y ésta los recibió, ¿cómo es posible que ella rehusara la cantidad de $100, especialmente tratándose de una mujer pobre como lo es Dolores Ortiz?

Una prueba tan débil como la presentada por la demandante no demuestra, a nuestro juicio, que ésta se hallase en la posesión continua del estado de hija natural del demandado, como exige la ley, para que el padre esté obligado a reconocerla. Interpretando la palabra *continuo* que aparece en el número 2 del artículo 125 antes citado, ha dicho este Tribunal en el caso de *Colón* v. *Sucn. A. J. Tristani,* 44 D. P.R. 171, 181:

"El adjetivo *continuo,* dice Scaevola, tiene varias acepciones, y en el caso del artículo 135 no puede tomarse en el de 'sin interrupción', sino en el de 'cosa que sigue a otra', determinándose así con el otro calificativo de 'constante', expresivo de perseverancia o repetición de actos. En nuestro concepto la palabra *continuo* debe interpretarse en el sentido de referirse a una serie de actos, a un conjunto de hechos ejecutados por la persona de quien se reclama el reconocimiento, y que sean bastantes, al examinarlos en globo, para constituir la posesión del estado de hijo natural. Una vez que esta serie de actos se ha realizado por un período razonable de tiempo, el padre no debe estar autorizado para revocar por sus actuaciones posteriores el reconocimiento que antes hizo."

Tampoco existe evidencia alguna tendente a demostrar que el demandado y Dolores Ortiz vivieran en concubinato en momento alguno. De la declaración de Dolores Ortiz sólo resulta que tuvo contacto carnal con el demandado cuatro o seis veces en la habitación que ocupaba ella en la casa de doña María Dragoni, donde hacía trabajos domésticos, y que luego de realizados esos actos, el demandado sólo volvió donde ella con ocasión de la visita a la niña ocho días después de su nacimiento. En tales circunstancias, no hay base alguna que justifique la conclusión de que existiera en momento alguno el estado de concubinato.

Del récord no resulta que el juez inferior actuara en este caso movido por pasión, prejuicio o parcialidad. Es obligación de todo abogado levantar en defensa de su cliente cualquier cuestión que sea pertinente y esté basada en la verdad, pero no es correcto, a nuestro juicio, hacer imputaciones como la de este caso, cuando no existe la más ligera evidencia que la sostenga, y por el contrario el récord demuestra que el juez actuó dentro de la más estricta imparcialidad.

*No existiendo ninguno de los errores señalados, procede la confirmación de la sentencia.*

OPINION DISIDENTE DEL JUEZ PRESIDENTE SR. DEL TORO

El presente es un recurso de apelación interpuesto por Ana María Ortiz, menor de edad, representada por su madre con patria potestad Dolores Ortiz contra la sentencia dictada por la Corte de Distrito de Ponce que desestimó la demanda que interpuso ante ella contra Silvestre Dragoni con el propósito de que la corte declarara que era hija natural reconocida del demandado.

En la demanda se alega que la demandante ''es hija de las relaciones amorosas y carnales habidas entre su madre con patria potestad Dolores Ortiz y el demandado Silvestre Dragoni;'' que la demandante nació el 29 de marzo de 1937 en Ponce cuando sus padres tanto al tiempo de su nacimiento como de su concepción eran solteros y se les conoció viviendo en concubinato y que el demandado reconoció ser su padre pública y privadamente.

El precepto legal aplicable está contenido en el art. 125 del Código Civil, ed. 1930, que es el 193 del Código Civil de 1902 tal como fué enmendado por ley de 9 de marzo, 1911, pág. 247, y que en lo pertinente dice:

''Son hijos naturales los nacidos, fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella.

"El hijo natural puede ser reconocido por el padre o la madre conjuntamente, o por uno solo de ellos, en el acta de nacimiento, o en otro documento público.

"El padre está obligado a reconocer al hijo natural:

"2. Cuando el hijo se halle en la posesión continua del estado de hijo natural del padre demandado, justificada por actos del mismo padre o de su familia.

"3. Cuando la madre fué conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo."

El demandado negó que hubiera tenido relaciones amorosas y carnales con la madre de la demandante, que ésta fuera su hija y que la hubiera reconocido como tal.

Fué el pleito a juicio, y la corte el 13 de junio de 1940 pronunció la sentencia recurrida. En su relación del caso y opinión después de referirse a las alegaciones y a la ley, dijo:

"Para nuestro concepto la prueba ofrecida por la demandante no sostiene su contención. Dolores Ortiz, madre con patria potestad de Ana María Ortiz, con su declaración destruyó su teoría."

Procede entonces a analizar la evidencia presentada, y concluye:

"La prueba que tenemos ante nosotros tampoco justifica que consideremos a la demandante Ana María Ortiz como que se ha encontrado en la posesión continua del estado de hija natural de Silvestre Dragoni, justificada por actos del mismo padre o de su familia.

"Para nuestro concepto tampoco se probó que Dolores Ortiz se conociera viviendo en concubinato con el demandado Silvestre Dragoni durante el embarazo y al tiempo del nacimiento de Ana María."

Como era lo lógico de acuerdo con esas conclusiones, desestimó la demanda, con costas.

No conforme la demandante, apeló. Señala en su alegato cuatro errores, todos relacionados con la apreciación de la prueba. Para resolver el recurso tenemos pues que proceder al estudio de la misma.

La primer testigo que declaró fué la madre Dolores Ortiz. Dijo que era soltera, que la niña que tenía en sus brazos se llamaba Ana María Ortiz, de dos años y diez meses de edad y era su hija nacida en Ponce el 29 de marzo de 1937, siendo el padre Silvestre Dragoni, el demandado, a quien señala en el salón de la corte. Que conoció a Dragoni en 1934 en la casa de doña María Dragoni, en Maragüez, campo de Ponce, donde ella lavaba, planchaba y cocinaba; que dormía en un cuarto de la casa; que el demandado vivía con su familia, en la Hacienda de Maragüez, un poco distante; que "el me enamoraba. En el treinta y cinco él me enamoraba y me ofrecía casarse conmigo y honrarme. Entonces, en eso ocurrió, de que un día, o una noche mejor dicho, yo estando en mi cuarto, se valió de la ocasión, que dejó una puerta de mi cuarto abierta, y se metió al cuarto y me hizo el daño."

Que tuvo contacto carnal con él "una vez"; que Dragoni era soltero y ella también; "me prometió comprarme una casa y casarse conmigo;" "cuando me encontraba encinta se lo dije a él, a Silvestre Dragoni, que no tenía donde vivir, y me dijo: 'váyase a vivir a casa de su hermana, que cuando coja una herencia de mi papá, le compro una casa y nos casamos.'" Eso fué cuando estaba embarazada, de cuyo embarazo nació Ana María Ortiz.

A la siguiente pregunta del abogado del demandado: "¿Usted quedó encinta la primera noche?" contestó: "No, señor, él iba. Yo quedé encinta el 28 de junio de 1936. La primera vez se valió de la ocasión de dejarme el cuarto abierto. Tenía dos puertas el cuarto. Me cogió dormida. No tengo ni la culpa. . . . Desde que quedé encinta no volvió más."

Estando encinta se fué a vivir a casa de su hermana Alejandrina Ortiz, en la Calle Mayor 160, de Ponce. Allí dió a luz y como a los ocho días fué a la casa el demandado. "Como era hija de él, él la fué a visitar", dejándole dos dólares. Después ella ha sido la que sostiene a su hija. "Tengo

que estar cosiendo para mantenerla. Yo misma le compro la leche y los vestidos. En cuanto a medicinas como la ingresé en la Clínica de Sanidad, ahí tengo medicinas."

A preguntas del abogado del demandado, contesta que denunció el hecho al fiscal. "Vine, pero no me hicieron caso; como no me atendieron a lo que dije, no volví más." Que denunció al acusado por abandono de menores en la corte municipal y lo sentenciaron. Interviene el abogado de la demandante y dice: "Eso es inmaterial. No veo por qué ... "; el abogado del demandado expresa: "Retiramos la pregunta." Y el juez decide: "Se tiene por desistido de la pregunta y eliminada."

Llamado a declarar Manuel Borrero manifestó que conoce al demandado y a Dolores Ortiz; que la demandante es su ahijada. Vivía al lado de donde nació y la madre le dijo "que si mi esposa y yo le hacíamos el favor de echarle agua a esa niña" y con gusto lo hicieron. Que después del nacimiento de la niña se encontró con el demandado y lo trató de compadre y le explicó la situación de la señora y la niña. "Le dije: 'Usted debe hacer algo por esa señora' y él me contestó que él le había dado cien pesos, y que ella no los había querido, y que no le daba nada."

A la pregunta "¿Hablaron de la niña?", se opuso el demandado por su abogado, por sugestiva, y el juez resolvió: "El testigo es de la parte demandante y las preguntas no deben ser sugestivas. Se ordena la eliminación de la pregunta."

Trató de hacerla en otra forma la demandante por su abogado y continuó en su oposición el demandado. El testigo entre tanto por sí mismo manifestó: "Hablamos de la niña precisamente." Y el juez dijo: "No puede contestar."

Se prolongó el incidente sin que el abogado de la demandante pudiera llegar a una fórmula satisfactoria para el abogado de la parte contraria y de la corte a fin de hacer su pregunta. Entonces interrogó al testigo: "¿Dice que cuando

saludó a Silvestre Dragoni lo trató de qué?'', y el testigo contestó: ''De compadre.''—''¿Por qué?''—''Porque le había bautizado. . . .'' Interviene el abogado del demandado: ''Esa es una conclusión . . .'' Y el juez resuelve: ''Hasta ahora no ha sido conectado el estado de compadrazgo del testigo, por el hecho de haber bautizado una hija de él. Luego es una conclusión y se elimina.''

Sigue el abogado de la demandante interrogando al testigo sobre los cien dólares: ''¿Por qué fué que usted le dijo a Dragoni que ayudara a esa señora?'', le preguntó, y el testigo contesta: ''Porque ella me había dicho que esa niña era hija del Sr. Dragoni.'' Seguidamente se opone el abogado de la parte contraria. ''Que se elimine'', pide, y el juez resuelve: ''Que se elimine, por ser un *'hearsay evidence.'* '' El interrogatorio termina: ''Lic. Frank Torres: ¿Sabe quién es el padre de la niña?—Lic. Hernández Matos: Me opongo. —Juez: Con lugar. Eso es para la corte determinarlo.— Lic. Frank Torres: ¿Sabe si Silvestre Dragoni hizo alguna manifestación con referencia a la niña Ana María Ortiz en la conversación?—Lic. Hernández Matos: Sugestiva.—Juez: Con lugar. Compañero. ¿Va a ser esto muy largo? Son las doce y pico. Haga la pregunta general y que conteste el testigo sobre hechos con referencia a la alegada paternidad, pero no conclusiones. S. Sa. está haciendo preguntas sugestivas, la otra parte presenta su objeción y la corte tiene que sostenerla.—Lic. Frank Torres: Nada más con el testigo por ahora.''

En la sesión de la tarde se llamó a la testigo Marcolina Heredia. Dijo: ''La señora Dolores Ortiz la conocí en la calle Mayor Cantera ciento sesenta, y al poco tiempo tuvo esa muchachita. Volví a visitarla y ya tenía la niña Ana María Ortiz ocho días de nacida. Entonces, al estar, como a los diez minutos, llegó este señor, Silvestre Dragoni. . . . Entonces deseó ver su hija Ana María Ortiz; y pasó hacia el cuarto acariciándola. La cogió y la acarició. . . . Al cuarto

de la señora, y preguntó por su niña, y la acarició, tratándola de 'mi hija', y le dijo: 'mi visita es corta, porque tengo que andar unas diligencias.' Puso la niña en la cama y sacó dos pesos y se los dejó a la niña para los alimentos.''

Guillermo Ortiz, hermano de Dolores, madre de la demandante, dijo que conocía al demandado y lo señaló en la sala de la corte. ''Conocí a Silvestre Dragoni en la propiedad de la tía, la señora María Dragoni, en el Barrio Maragüez, en el mil novecientos treinta y cuatro. . . Además, creo que vivió en la. misma propiedad, y al tiempo de vivir en la propiedad, llevó amores con mi hermana en el treinta y seis. Entonces en el mes de julio, estuvo Silvestre Dragoni a la quinta, a la ciento sesenta de la Mayor Cantera y nos dijo que llevaba amores carnales con nuestra hermana, pero que tenía entendido ponerle una casa y seguir viviendo con ella. . . . El 26 de diciembre del 1936 llegó nuestra hermana a la Mayor Cantera, donde vivimos nosotros, y allí nos declaró que ella se encontraba encinta de Silvestre Dragoni.'' Se opuso el demandado por su abogado pidiendo la eliminación y la corte la decretó. Continúa el testigo manifestando: ''Entonces, pues no había visto más a Silvestre Dragoni hasta el 29 .de marzo de 1937 que ella dió a luz la niñita, y a los ocho días de haber dado a luz la niñita llegó Silvestre Dragoni a la quinta. . . Entró y preguntó por la hijita que había tenido la hermana de nosotros; entonces estuvo hasta el cuarto donde estaba ella y acarició la niñita, estuvo un rato y le entregó dos pesos a mi hermana para la niñita.''

Refiriéndose luego a un envío de diez dólares del demandado a su hermana contestó al juez: ''Ahí me encontré con la cuñada mía, viniendo de casa de Rafael Pasarell y ella estando hablando conmigo, Lorenzo Dragoni la llamó y le entregó diez dólares que había mandado Silvestre para alimentos de la niña, y ella se los llevó para la Mayor Cantera ciento sesenta, donde vivía mi hermana.''

La prueba de la demandante terminó con la declaración de Juan Vázquez. Manifestó que conocía a Dolores Ortiz y de vista al demandado. También a la niñita. Se le preguntó: "¿Sabe de quién es esa niña hija?" contestó que Dolores la había visitado con una niñita. "Entonces le pregunté, '¿quién es el papá?'—'pues Silvestre Dragoni.'" Se opuso y pidió la eliminación el abogado del demandado y la corte la decretó. Y manifestando que conocía a Dolores como soltera viviendo arrimada con una hermana, terminó su declaración.

Presentó una moción de *nonsuit* el demandado que fué declarada sin lugar en la siguiente forma: "Compañero, creo que ganaríamos más tiempo si resolviéramos esta cuestión ahora y que se le anotara una excepción. La corte entiende que ha habido alguna prueba, y la jurisprudencia del Supremo es que cuando hay alguna prueba se debe ir al fondo del asunto. Se le anota una excepción."

Manifestó el demandado por su abogado que no tenía prueba que presentar, pero cambió luego de criterio, e introdujo la declaración de Lorenzo Dragoni, tío del demandado. Dijo que conoció a Dolores Ortiz. "Cuando compré la finca de Maragüez, ella vivía en una casita con su padre." Manifestó que no era cierto que entregara delante de Guillermo Ortiz la suma de diez dólares para Dolores.

Se le pregunta "¿Usted sabe si alguna vez esta señora vivió en concubinato, bajo un mismo techo. . . ?" Se opone la demandante por su abogado y la corte declara con lugar su oposición. Contesta después que nunca ha sabido que entre demandante y demandado hubiera "alguna vez algún estado de relaciones." Que el demandado ha vivido siempre con él, en Maragüez y Montes Llanos. Que antes de diciembre de 1936 Dolores Ortiz "estaba en casa de mi hermana. Lavaba, planchaba y cocinaba." Salió de la casa porque "a veces se ausentaba, se venía para el pueblo y estaba unos días; pernoctaba en el pueblo, y también estaba sus noches

en la Hacienda El Tesoro. Se le llamó la atención y ella se enojó y se fué.''

Tal, en substancia, la evidencia aportada por ambas partes. Estoy conforme con el juez sentenciador en que no demuestra la existencia de un concubinato entre demandante y demandado, pero a mi juicio sí demuestra que el demandado tuvo relaciones sexuales con Dolores Ortiz y que como resultado de ellas nació la demandante, relaciones cuya existencia reconoció mientras tenían lugar ante Guillermo Ortiz, hermano de Dolores; que estuvo en la casa de la hermana de Dolores Ortiz donde ésta vivía y donde dió a luz a la demandante, pocos días después del alumbramiento, tomó en sus brazos la niña y la trató como hija suya en presencia de Marcolina Heredia, extraña a la familia; que luego, al encontrarse con Manuel Borrero, padrino de la demandante, y al ser tratado por éste de compadre, manifestó que había ofrecido a Dolores cierta suma de dinero que no había querido aceptar y que nada más haría.

¿Es suficiente esa prueba para declarar que la demandante se hallaba en la posesión continua del estado de hija natural del padre demandado? Me veo obligado a reconocer que es éste uno de los casos de prueba más débil en cuanto a dicha condición que se ha presentado ante nosotros y que en tal virtud mi primera intención fué decidirlo siguiendo el camino marcado en el de *Delannoy* v. *Sucesión Cividanes,* 53 D.P.R. 114, 119:

"Puede admitirse que si esto fuera todo o que si el juez de distrito hubiese dictado sentencia en favor del demandante, la prueba de éste habría bastado para sostener tal sentencia. Puede admitirse que el caso en su totalidad es uno dudoso (*border case*). Sin embargo, en todos los casos en que el apelante se funda, la prueba fué mucho más fuerte que en el presente. Véanse: *Cruz* v. *Santiago,* 24 D.P.R. 108; *Montalvo* v. *Montalvo et al.,* 25 D.P.R. 858; *Cruz* v. *Quiñones,* 31 D.P.R. 339; *Vega* v. *Sucn. Vega,* 32 D.P.R. 595; *Guadalupe* v. *González,* 34 D.P.R. 669; *Colón* v. *Sucn. Tristani,* 44 D.P.R. 171.

"En los primeros cuatro de estos casos las sentencias en favor de los demandantes fueron confirmadas. En el quinto y sexto la prueba fué suficientemente fuerte para dejar satisfecha a la mayoría de este tribunal, no obstante el criterio contrario de la minoría y del juez de distrito.

"Cividanes, su querida y su primo Román Sobrino, quien también era socio suyo en el negocio de licores, vivían todos en el segundo piso de una casa donde tenían el negocio. En época anterior a la fecha en que Cividanes contrajo matrimonio, su querida abandonó la isla. Su partida fué en realidad, según parece, condición precedente al matrimonio en perspectiva. Tanto Sobrino como Cividanes fallecieron antes de que se iniciara el presente litigio.

"Maximina Santiago declaró que Román Sobrino también estaba casado y vivía con su esposa en los altos de la casa de la licorería cuando María Delannoy regresó a ella después de dar a luz un niño. Los demandados ofrecieron prueba documental para demostrar que Sobrino no se casó hasta allá para el año 1897. Maximina estuvo muy segura en su aseveración durante la repregunta de que Sobrino ya estaba casado cuando María Delannoy regresó a la casa. Empero, fuera de esta discrepancia, ella parece haber sido una testigo desinteresada, y su declaración resistió la repregunta. A veces tenía ciertos visos de verdad que tendían a hacerla algo más fuerte que el testimonio de cualquier otro testigo del demandante.

"No trataremos de reseñar la prueba de la sucesión demandada. Fué necesariamente de carácter negativo. No obstante, el juez de distrito estuvo justificado al dar, como lo hizo, considerable importancia al hecho de que ninguno de los amigos más íntimos de Cividanes tuviera conocimiento del hecho, de serlo, de que Agustín Delannoy era su hijo natural, o de que Cividanes lo había tratado como tal. Guayama no es un pueblo grande. Era aún más pequeño en 1896. Cividanes, una vez muerta su esposa, tuvo hijos naturales sobre quienes habló con sus amigos, a quienes reconoció abiertamente y a quienes finalmente legitimó al contraer segundas nupcias con la madre de ellos.

"Aun después de transcurridos casi cuarenta años, fué un hecho significativo que entre aquellos que mejor conocían a Cividanes no pudiera encontrarse ninguna persona responsable y desinteresada que corroborara el testimonio de María Delannoy y el de su hijo respecto al supuesto reconocimiento de este último por Cividanes como hijo natural suyo.

"No hallamos tan manifiesto error en la apreciación de la prueba que justifique la revocación de la conclusión a que llegó el juez de

distrito al efecto de que el demandante nunca había disfrutado de la posesión continua del estado de hijo natural, conforme exigía la ley en vigor al tiempo de su nacimiento y para la época en que ocurrieron la mayoría de los supuestos hechos en que se funda para demostrar el reconocimiento."

Varié, sin embargo, de criterio al considerar que aquí no se trata de un caso de hace cuarenta años en que el propio demandado y testigos importantes dejaron de existir, si que de uno reciente en que el demandado vive y asiste al juicio y no declara, y queda en pie el hecho básico de ser la demandante en realidad de verdad la hija del demandado nacida a virtud de sus relaciones sexuales con Dolores Ortiz.

Bajo esas circunstancias me parece que por pocos que sean los actos de reconocimiento del padre y por débil que a primera vista parezca la prueba sobre los mismos, guiados por el espíritu de nuestra jurisprudencia en *Colón* v. *Sucn. Tristani,* 44 D.P.R. 171, el tribunal debería enforzar la obligación del padre, y en su consecuencia revocar la sentencia apelada y dictar otra declarando la demanda con lugar.

Hablando por la corte en el dicho caso de *Colón* v. *Sucn. Tristani,* el Juez Sr. Córdova Dávila se expresó como sigue:

"Hemos estudiado la jurisprudencia establecida por este Tribunal Supremo en lo referente a la prueba de posesión de estado. Esta corte en sus decisiones aprecia los elementos de prueba que se han presentado en cada caso y su valor probatorio. Esta jurisprudencia es aplicable a aquellos casos en que se ventila la posesión de estado independientemente de las relaciones íntimas que han mediado entre la madre y el padre putativo; pero cuando las relaciones sexuales han quedado establecidas y surge en la mente del juzgador la presunción de la paternidad, esta presunción, corroborada y robustecida por otros actos del padre, puede ser suficiente para que se obtenga y recaiga una declaración de hijo natural. Sería injusta una ley que una vez demostrado que hay un padre, no facilitase los medios de obligarle a asumir las responsabilidades contraídas con el hijo que engendró. Ese no pudo ser el pensamiento del legislador; ése no puede ser el espíritu de las disposiciones del artículo 193 del Código Civil."

Ocho años han transcurrido y me parece hoy aún más justo el criterio en aquel entonces sustentado, criterio que debe a mi juicio aplicarse liberalmente a fin de que la justicia que consagra sea en la realidad debidamente administrada.

No deben existir hijos sin padre. No debe eludirse la responsabilidad que liga al que engendra un ser humano con el fruto de su acto. Una vez que se demuestre la paternidad y que esa paternidad ha sido reconocida de alguna manera por el padre, no debe permitirse que el egoísmo, que las relaciones de familia, que las graves consecuencias materiales y morales que ello generalmente trae consigo, anulen el primer impulso espontáneo a virtud del cual se dejó oír la voz de la naturaleza misma, porque esa primera actuación es la que entraña la verdad y la justicia.

Siendo el expuesto el juicio que he formado de los hechos y la ley en este caso, claro es que no puedo estar conforme con la opinión de la mayoría de los jueces de esta corte y disiento.