RAFAEL BIANCHI MARTÍNEZ, demandante y apelado, *v.* SUCESIÓN DE FRANCISCO BIANCHI ROSAFÁ, compuesta por LUISA BIANCHI ITURRINO, ET AL., demandados y apelantes.

Núm. 9365.—*Sometido:* Mayo 5, 1947. *Resuelto:* Julio 11, 1947.

*Oscar Souffront* y *José Sabater García,* abogados de los apelantes; *Francisco Vizcarrondo* y *Rafael Rivera Zayas,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tritribunal.

En la demanda enmendada radicada en este caso se alega sustancialmente que el causante de la sucesión demandada, Francisco Bianchi Rosafá, falleció en 12 de abril de 1945; que el demandante es hijo natural reconocido de dicho causante y que nació como resultado de las relaciones maritales sostenidas por éste con su madre Carmen Tomasa Martínez Rovira, siendo sus padres solteros para aquel entonces y no habiendo impedimento alguno para que ellos contrajeran matrimonio al tiempo de su concepción y nacimiento, el cual tuvo lugar en 13 de mayo de 1912; que Alfonsia Courtier asistió en su carácter de comadrona a la madre del demandante a instancias de su padre Francisco Bianchi Rosafá, quien

pagó a dicha comadrona los servicios por ésta prestados; que Francisco Bianchi Rosafá siempre reconoció al demandante como hijo natural suyo y daba a éste privada y públicamente el trato familiar y ostensible de hijo natural reconocido; que cuando tenía seis años de edad él y su madre se trasladaron a la ciudad de Ponce, donde ella seguía percibiendo ayuda económica de Francisco Bianchi Rosafá para el sostenimiento del demandante y que Bianchi Rosafá siguió haciendo esto hasta el año 1923 en que su madre falleció; que una vez muerta su madre él se trasladó a la casa de su tío Darío Rovira, en San Juan, y durante ese tiempo continuó recibiendo ayuda económica de su padre, personalmente y por correo; que muerto su tío Darío Rovira en 1929, el demandante solicitó el reconocimiento de su padre y éste siempre le contestó que oportunamente lo reconocería; que a los familiares de Bianchi Rosafá les consta que el demandante es hijo natural reconocido de dicho señor, no habiéndose materializado el reconocimiento debido a la firme disposición de su padre de hacerlo oportunamente; que por el afecto y respeto que el demandante siempre dispensó a su padre confió en todo momento en las manifestaciones de éste, pero que habiendo muerto su padre sin haber dado cumplimiento a lo ofrecido, él se ha visto precisado a reclamar el derecho que le corresponde.

Los demandados María Bianchi Suárez, Jaime Bianchi López y Luis Guasp Bianchi contestaron la demanda y negaron los hechos esenciales de ésta. Los demás están en rebeldía.

Trabada así la contienda fué el pleito a juicio, ofreciéndose amplia prueba testifical y documental. La corte inferior dictó más tarde extensa opinión declarando al demandante hijo natural reconocido de Francisco Bianchi Rosafá con todos los derechos inherentes a tal condición. No conformes, Juan Bianchi López y Luis Guasp Bianchi han apelado para ante este Tribunal.

Cuatro son los errores que señalan en apoyo de su recurso, a saber: (1) que la corte inferior cometió error al declarar que Francisco Bianchi Rosafá vivía en concubinato con la madre del demandante; (2) al declarar que el demandante estuvo en estado constante de hijo natural de Francisco Bianchi Rosafá; (3) al no aceptar e ignorar la alegación de los demandados apelantes de que al gestionar el demandante por medio de sus amigos Pedro Blanch y Waldemar Bithorn su reconocimiento como hijo de Francisco Bianchi Rosafá y al no incluirle éste en su testamento como hijo y heredero, se estableció una cuestión de derecho consistente en que el causante de manera expresa y por medio de documento privilegiado (*sic*) negó su reconocimiento al demandante, quedando la prueba testifical sobre reconocimiento, única que se presentó, tildada de falsedad; y (4) que la prueba testifical presentada por el demandante no estableció ni el concubinato ni el estado constante de hijo natural reconocido, por lo que la corte *a quo* cometió manifiesto error en la apreciación de esa prueba y sus conclusiones legales no sólo no están sostenidas por la prueba sino que son contrarias a ella.

Como los errores 1, 2 y 4 se dirigen a la apreciación de la prueba hecha por la corte inferior, es necesario hacer la siguiente reseña de la misma:

*Rafael Bianchi Martínez* es el demandante en el caso y nació el 13 de mayo de 1912 en Mayagüez, siendo su madre Carmen Tomasa Martínez. Recuerda que Francisco Bianchi Rosafá visitaba a ésta entre días y lo trataba a él "como mi padre al fin, porque era mi padre." Le decía "Rafaelito *mijo*" y él llamaba a Bianchi Rosafá "papá." Después de él mudarse a Ponce con su señora madre Bianchi Rosafá la visitaba a ella y lo trataba a él como hijo. Él siempre le decía papá a Bianchi. Mientras su madre vivió en Ponce su padre la sostenía y después de morir ésta él vino a vivir a San Juan con su tío Darío Rovira, hasta que éste murió en 1929. Muerto su tío él tuvo oportunidad de ver en San Juan a su padre y

cuando iba a ver a Bianchi Rosafá en San Juan éste le daba
$25 ó $50. Siempre lo ayudaba y lo trataba como su padre
que era, "con mucho cariño y como que yo era su hijo." Él
fué en distintas ocasiones a Mayagüez y siempre se hospedaba
en casa de su hermano Juan Bianchi Ramos. En Mayagüez
fué presentado por Bianchi Ramos a otros hijos de Bianchi
Rosafá. Al hacer aquél la presentación siempre decía "éste
es un hermano de nosotros."

*José Antonio Fábregas* fué empleado de Francisco Bianchi
Rosafá por espacio de 27 años y era hombre de absoluta con-
fianza de éste. Recuerda que el demandante escribió en so-
licitud de ayuda y que él le mandó $50 por órdenes del Sr.
Bianchi Rosafá. En las cartas el demandante alegaba que
era hijo de don Francisco y al leerle las cartas—Bianchi
estaba casi ciego—éste le decía "deja eso para después." Su
impresión es que "Martínez Rovira" era hijo de Bianchi Ro-
safá. Éste no decía que el demandante fuera hijo suyo; no
lo admitió, pero tampoco lo negó.

*Pedro Blanch* declaró que Francisco Bianchi Rosafá y él
eran íntimos amigos y que conoció a Carmen Tomasa Martí-
nez desde que él era niño; que Bianchi Rosafá y Carmen To-
masa fueron novios y después vivieron bajo un mismo techo
en la calle Liceo número 2, en Mayagüez; que el noviazgo
empezó en 1911; que don Paco—refiriéndose a Bianchi Ro-
safá—la visitaba con frecuencia y que en varias ocasiones lo
encontró allí de visita; que Carmencita, quien tenía para aquel
entonces de 14 a 15 años, era la amante de don Paco y cuando
ella fué a dar a luz la asistió una comadrona llamada Alfonsia
Courtier; que vió cuando Bianchi dió a esa comadrona un
sobre, mas no sabe lo que éste contenía; que Carmencita si-
guió siendo amante de don Paco mientras él vivió en Maya-
güez, habiendo él venido a vivir a San Juan en 1913; que
Carmencita tuvo un niño y don Paco lo llamaba como hijo
suyo; que estando en San Juan el menor le fué presentado por
Darío Rovira y que él lo reconoció por un lunar que éste tiene;

que en una ocasión fué con Darío al Hotel Palace a ver a don Paco Bianchi sobre el reconocimiento del niño y que don Paco contestó "yo arreglaré eso a su debido tiempo"; que Bianchi siempre trataba al niño como hijo suyo y en dos ocasiones le mandó $50 con él; que le consta que mientras él vivió en Mayagüez Bianchi Rosafá dormía siempre en casa de Manyo en la calle Méndez Vigo; y que éste siempre iba a dormir a su casa como entre 10:30 y 11 p. m.

*Waldemar Bithorn Huicy* también conoció íntimamente a Francisco Bianchi Rosafá desde el año 1908. De 1910 al 1912 conoció a Carmen Tomasa Martínez en la calle Liceo número 2, de Mayagüez. Le consta que Bianchi visitaba a Carmen Tomasa. A veces él y Bianchi venían de Añasco a Mayagüez, visitaban a Carmen y él dejaba entonces a Bianchi solo en la casa de ésta. Bianchi Rosafá le dijo "ahora tengo un niño" y al preguntarle el testigo de quién era, éste le contestó: "De Carmen Tomasa." Después del nacimiento del niño Bianchi siguió visitando a Carmen. Al niño se le llamó Rafael, y Bianchi visitaba la madre de éste en calidad de amante durante los años 1910 al 1912. Volvió a ver al niño en San Juan, ya que Darío Rovira se lo llevó para que él lo viera. Entre el demandante y don Francisco Bianchi existía un trato como el de padre a hijo. Rafael llamaba papá a don Paco y éste trataba al demandante como hijo.

*Armando Rodríguez* conoció a Francisco Bianchi Rosafá íntimamente y también al demandante. Más tarde se trasladó a Ponce y siendo allí guardia de penales vió cuando don Francisco Bianchi Rosafá visitó varias veces a Carmen Tomasa, a quien el declarante le había cedido en arrendamiento una habitación.

*Amparo Bianchi* conoció a Francisco Bianchi Rosafá por ser abuelo y padrino de ella, así como al demandante, quien es tío suyo, hermano de su papá. Conoció al demandante en su propia casa, ya que su papá lo trajo. Rafael Bianchi Martínez venía a Mayagüez a pedirle ayuda a su abuelo Francisco

Bianchi Rosafá y cuando esto ocurría su papá se lo llevaba a su casa y se hospedaba en ella. Su padre trataba al demandante como hermano. En una ocasión se lo presentó a su tío Manuel y a su tía Carmela.

*Raúl Bianchi* declaró en términos similares a como lo hizo la anterior testigo.

Con esta prueba ante sí, repetimos, la Corte de Distrito de Mayagüez declaró al demandante hijo natural reconocido de don Francisco Bianchi Rosafá. Entendió no sólo que se había probado el concubinato entre la madre del demandante y el causante de la Sucesión demandada, sí que también la posesión de estado. Si se examina la anterior reseña que de la prueba hemos hecho se verá que los testigos están contestes en que Carmen Tomasa Martínez y Francisco Bianchi Rosafá, siendo ambos solteros, sostuvieron relaciones sexuales por espacio de varios años. Sin embargo, no nos demuestra la prueba que Bianchi Rosafá tuviera a Carmen Tomasa como su concubina, sino más bien como su querida o amante. Conforme dijimos en el caso de *Medina* v. *Sucesión de Bird, et al.,* 30 D.P.R. 158, 161, "El concubinato a que alude el Código Civil se refiere a la condición de vivir juntos lo mismo que marido y mujer sin estar realmente casados. No es suficiente que un hombre coloque a una mujer en una casa y frecuentemente la visite, especialmente si él tiene un hogar propio independiente . . ."[1] En el presente caso la prueba no revela que Bianchi Rosafá y la madre del demandante vivieran como marido y mujer sin estar realmente casados. Meramente revela que el causante de la sucesión demandada visitaba a la madre del demandante con alguna frecuencia[2] y que como resultado de las relaciones amorosas que entre ellos existieron nació el aquí demandante. Creemos pues, que la corte infe-

---

[1] *Cf. Ortiz* v. *Dragoni,* 59 D.P.R. 14, 18; *Carradero* v. *Lebrón,* 58 D.P.R. 135; *Estela* v. *Sucn. Medraño,* 51 D.P.R. 548; *Góñez* v. *Palmieri,* 50 D.P.R. 457 y *Colón* v. *Sucn. A. J. Tristani,* 44 D.P.R. 171, 208.

[2] *González* v. *Sucn. Sánchez,* 40 D.P.R. 155, 157 y *Gerena* v. *Suau,* 36 D.P.R. 170.

rior cometió error al decir en su opinión que había quedado establecido el concubinato entre la madre del demandante y el causante de la sucesión demandada. La apelación, sin embargo, se da contra la sentencia y no contra los razonamientos o fundamentos de la opinión[3] y la sentencia aquí dictada puede sostenerse por otros motivos.

Si continuamos analizando la prueba, necesariamente tenemos que llegar a la conclusión de que la posesión continua del estado de hijo natural del causante de la sucesión demandada, justificada por actos del mismo causante o de su familia quedó debidamente demostrada. Art. 125, inciso 2, del Código Civil, edición de 1930. Existe prueba de las relaciones ilícitas entre la madre del demandante y el causante de la demandada, así como de que en innumerables ocasiones Francisco Bianchi Rosafá reconoció la paternidad del demandante, llamando a éste hijo, tratándolo como tal, haciéndole regalos, etc. Conforme dijimos en *Colón* v. *Sucesión de A. J. Tristani,* 44 D.P.R. 171, 181:

"En nuestro concepto la palabra *continuo* debe interpretarse en el sentido de referirse a una serie de actos, a un conjunto de hechos ejecutados por la persona de quien se reclama el reconocimiento, y que sean bastantes, al examinarlos en globo, para constituir la posesión del estado de hijo natural. Una vez que esta serie de actos se ha realizado por un período razonable de tiempo, el padre no debe estar autorizado para revocar por sus actuaciones posteriores el reconocimiento que antes hizo. Establecer un principio contrario equivaldría a autorizar al padre para dejar sin efecto hechos que hubieran podido bastar al hijo para obtener su reconocimiento, si la acción se hubiese ejercitado con anterioridad a la fecha en que quedaron interrumpidas las relaciones que antes mediaron entre ambos."

Quedó, pues, establecida a nuestro juicio la posesión de estado, no existiendo en su virtud los errores segundo y cuarto[4]

---

[3] *Escudero* v. *Mulero,* 63 D.P.R. 574, 588 y *Cruz* v. *Carrasquillo,* 61 D.P.R. 435.

[4] *Cf. Cruz* v. *Carrasquillo,* 61 D.P.R. 435; *Torres* v. *Sucn. Caballero,* 39 D.P.R. 724 y *Fontánez* v. *Sucn. Buxó,* 36 D.P.R. 227.

■ El tercer error señalado no merece seria consideración. Se recordará que el mismo se refiere al hecho de que al no incluir el causante en su testamento al demandante como hijo y heredero se estableció una cuestión de derecho consistente en que el causante de manera expresa y por medio de documento privilegiado, negó su reconocimiento a éste, quedando la prueba testifical sobre el reconocimiento tildada de falsedad. Precisamente por el hecho de no habérsele reconocido es que el demandante se ha visto obligado a entablar la acción que nos ocupa. No es de extrañar que no obstante los actos de un padre demostrativos de la posesión de estado o de cualquier otra forma de reconocimiento, éste más tarde se niegue a reconocer al hijo o no lo incluya como tal en su testamento. A veces aun hijos legítimos son preteridos.(5) Según dijimos en *Colón* v. *Sucesión de A. J. Tristani,* supra, a la pág. 176, citando a Scaevola, tomo 1, pág. 350 de su "Jurisprudencia del Código Civil," es frecuente el hecho de personas que negando el orden natural, desobedientes a la ley de la sangre, menosprecian el hermoso título de padre y olvidan los deberes congénitos de la paternidad. Además, conforme expresó este Tribunal por voz de su Presidente Sr. Del Toro en *Vázquez* v. *Sucn. Boyrié,* 52 D.P.R. 856, 865 "La actitud del padre al no reconocer a sus hijos por escrito antes de morir, no destruye su anterior actuación." Esas palabras son de entera aplicación al caso que está ante nos. El error señalado bajo este número no fué cometido.

*Debe confirmarse la sentencia apelada.*

---

(5)Véase artículo 742 del Código Civil, ed. de 1930.